```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF OHIO
 2                       WESTERN DIVISION


 3
                              - - -
 4
      UNITED STATES OF AMERICA,   .  CASE NO. 1:16-cr-019
 5                                .
                  Plaintiff,      .  Initial Appearance and
 6                                .  Plea on Information
           - v -                  .
 7                                .
      MUNIR ABDULKADER,           .  Thursday, March 24, 2016
 8                                .  11:05 a.m.
                  Defendant.      .  Cincinnati, Ohio
 9    . . . . . . . . . . . . . . .


10
                            PROCEEDINGS
11        BEFORE THE HONORABLE MICHAEL R. BARRETT, DISTRICT JUDGE

12

      For the Plaintiff:        TIMOTHY S. MANGAN, ESQ.  (AUSA)
13                              KENNETH L. PARKER, ESQ.  (AUSA)
                                United States Attorney's Office
14                              221 East Fourth Street, Suite 400
                                Cincinnati, Ohio  45202
15
      For the Defendant:        RICHARD SMITH-MONAHAN, ESQ.
16                              Federal Public Defender's Office
                                250 East Fifth Street, Suite 350
17                              Cincinnati, Ohio  45202

18
      Also Present:             FBI Special Agent Sherry Driessen
19                              Special Agent T.A. Staderman, II
                                Task Force Officer Andrew Schweier
20

21    Courtroom Deputy:         Barbara A. Crum

22
      Court Reporter:           Maryann T. Maffia, RDR
23                              239 Potter Stewart U.S. Courthouse
                                100 East Fifth Street
24                              Cincinnati, Ohio  45202
                                513-564-7677
25
```

1                    P R O C E E D I N G S

2            COURTROOM DEPUTY:  On the docket is District Court

3    Case Number 1:16-CR-19:  *United States of America versus Munir*

4    *Abdulkader.*

5        We're here this morning for an initial appearance and Plea

6    on Information.

7            THE COURT:  Okay.  Guys, I apologize.  I'm a little

8    under the weather, so if I trail off or anything like that,

9    just tell me to speak up.

10       Mare, we're under seal.

11       So will counsel enter their appearances for the record,

12   please.

13           MR. MANGAN:  Tim Mangan on behalf of the government.

14           MR. SMITH-MONAHAN:  Richard Smith-Monahan on behalf

15   of the defendant, Munir Abdulkader.

16           THE COURT:  Munir, do you mind if I call you by your

17   first name?  Is that okay?

18           THE DEFENDANT:  Yes, sir.

19           THE COURT:  All right.  So we are here to discuss

20   proceeding under an Information.  And I'm sure that Richard

21   has discussed this with you, but the Information involves

22   three counts, all violations of Title 18.  One is Section

23   924(c), the other is 1114, and the other is 2339B.

24       The Information indicates that while you were a resident

25   in the Southern District of Ohio on or about October 15th, the

1   Secretary of State designated al-Qa'ida as a Foreign Terrorist

2   Organization on May 15th.  There was an amendment to that.

3   There was al-Qa'ida, and also looks like ISIS was added.

4       And Tim, you correct me if I'm not saying what I need to

5   say on the record here.

6       The first count of the Information indicates that you

7   engaged in conduct wherein you were attempting to unlawfully

8   kill officers, employees of the United States while they were

9   engaged in or performing their official duties.  There was an

10  attempt to organize or engage in an attack to kill identified

11  military employees on account of his position.  And, in

12  furtherance of that, a firearm was purchased.

13      Then the second count is the actual purchase of the

14  firearm that says you knowingly possessed an AK-47 assault

15  rifle, and the purpose of you possessing that firearm was to

16  carry out the offense that's described in Count One of the

17  Information.

18      Then Count Three is that --

19          THE COURT:  What's the matter?

20          COURTROOM DEPUTY:  I'm going to go get the agents.

21  They are in the Clerk's office.

22          THE COURT:  Can I keep going?

23          MR. MANGAN:  Yes, sir.

24          THE COURT:  Then Count Three of the Information

25  indicates that you attempted to knowingly provide material

1    support and resources and services to those previously

2    described and defined by the Secretary as Foreign Terrorist

3    Organizations, in this case:  ISIL.

4        That's the 2339B violation.

5        There are also forfeiture counts that go along with the

6    particular information in this case, including the AK-47

7    assault rifle.

8        Now, what I'm going to do is, I am going to ask you some

9    questions about proceeding in the Information, Munir, because

10    what we have is, we have two tracks of criminal prosecutions

11    in this country.  One is called Information, and the other is

12    by Indictment.  You have a right to Indictment.  So I'm going

13    to discuss the differences with you.

14        I'll also discuss the constitutional rights that anybody

15    charged with an offense has in this country, and we'll talk

16    about how we're going to proceed.  Okay?

17        But what's going to have to happen is, I'm going to have

18    to ask you some questions.  Are you okay with that?

19            THE DEFENDANT:  Yes, Your Honor.

20            THE COURT:  And you're going to have to give the

21    answers.  But I'm going to have Miss Crum administer an oath

22    or affirmation to you, which means that you're going to agree

23    to answer truthfully to any questions I ask, anything we say.

24        Theoretically, if you lied to me about something,

25    Mr. Mangan could bring a criminal charge.  But the questions

1    I'm asking you are just about your knowledge of what we're

2    doing today, that is:  the Information versus the Indictment;

3    also your knowledge of the constitutional rights and your

4    willingness to waive those, if we get that far; and then a

5    discussion of the facts of the case.

6        Okay?  So are you okay with all that?

7            THE DEFENDANT:  Yes, sir.

8            THE COURT:  All right.

9        So Barb, will you administer an oath or affirmation?

10        (The defendant was duly sworn by the courtroom deputy.)

11            THE DEFENDANT:  Yes, ma'am.

12            THE COURT:  Okay.  Munir, do you have a middle name

13    or is your full name as it's stated on the Information?

14            THE DEFENDANT:  Full name, sir.

15            THE COURT:  Okay.  Great.  How old are you?

16            THE DEFENDANT:  I'm 21, sir.

17            THE COURT:  And I had an off-the-record conversation

18    with Richard before we came out.  My understanding is you

19    attended, what, Lakota High School?  Lakota school system?  Is

20    that where you're from?

21            THE DEFENDANT:  Yes, sir.

22            THE COURT:  Did you graduate?

23            THE DEFENDANT:  Yes, sir.

24            THE COURT:  How about after high school, any post-

25    high school education?

```
1              THE DEFENDANT:  Yes, sir.  I completed my second year
2    at Xavier University.
3              THE COURT:  Okay.  All right.  So I can take it from
4    that, and based upon the conversations we're having so far,
5    that you are competent and able to understand English and all
6    that stuff, that your comprehensive skills are okay; right?
7              THE DEFENDANT:  Yes, Your Honor.
8              THE COURT:  Okay.  Have you ever been treated --
9         This goes to your ability to have a knowing discussion
10   with me today.
11        Have you ever been treated for any kind of mental illness?
12             THE DEFENDANT:  No, sir.
13             THE COURT:  How about any problems with substance
14   abuse, alcohol abuse or anything like that?
15             THE DEFENDANT:  No, Your Honor.
16             THE COURT:  Okay.  Obviously you're incarcerated, so
17   can I assume that you haven't taken any type of illegal
18   narcotics, drugs or medicines in the past 24 hours?
19             THE DEFENDANT:  Yes, Your Honor.
20             THE COURT:  Good.  All right.
21        Richard, could you, just briefly on the record, describe
22   the kinds of conversations you've had with Munir and whether
23   or not you believe he is capable of entering a knowing,
24   intelligent and voluntary plea and a waiver at this time?
25             MR. SMITH-MONAHAN:  Yes, Your Honor.  I've actually
```

1    had a lengthy period of contact with my client prior to this

2    time.  We've had extensive conversations about the nature of

3    the evidence the government has, the nature of this

4    Information, an Information as opposed an Indictment, and

5    we've have talked many, many times about plea options and the

6    plea negotiations.

7        I believe he is fully informed of the nature of those

8    negotiations, and I believe he is fully competent to enter a

9    plea and that he would be doing so knowingly, intelligently

10   and voluntarily.

11           THE COURT:  Okay.  All right.  I have not read the

12   Information in its entirety; I've just basically tried to

13   capture the essence of it.

14       Richard, do you want a formal reading of the Information

15   at that time or are you willing to waive the reading?

16           MR. SMITH-MONAHAN:  We would waive reading of the

17   Information, Your Honor.

18           THE COURT:  Okay.

19       Even though we're not reading it in its entirety in open

20   court, Munir, I'm assuming that you and Richard have read it

21   together and discussed; right?

22           THE DEFENDANT:  Yes, Your Honor.

23           THE COURT:  Okay.  Did he explain to you what the

24   three counts of the Indictment meant?

25           THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  Okay.  Did he talk to you about the

2    potential penalties that would happen if you were convicted of

3    those three counts of the Indictment?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Okay.  What normally happens in a case

6    is, the lawyer, in this case Richard, would call the lawyer

7    for the government, and he'd say, "Okay.  What kind of

8    evidence do you have?  How do you intend to proceed?"

9      The lawyer for the government would then tell your lawyer

10   what kind of evidence they had.

11     Did you and Richard have a conversation about what kind of

12   evidence the United States claimed it can present in an open

13   court proceeding, like a trial, against you?

14     Did you guys have that conversation?

15         THE DEFENDANT:  Yes, Your Honor.

16         THE COURT:  Okay.  Did you guys then talk about,

17   "Okay.  Do we have any defenses?  Is there any way that we

18   should challenge this, or is the smartest thing to do is to

19   enter into negotiations to try to resolve the case?"

20     Did you have that kind of a conversation?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  Okay.  And do you think that Richard has

23   fully informed you about all the facts and circumstances you

24   need to know about the situation as it stands today?

25         THE DEFENDANT:  Yes, Your Honor.

1     THE COURT:  And is it safe for me to assume then

2  that, based upon the conversations that you and Richard had,

3  you decided that the smartest thing to do was to enter into

4  some type of an agreement or negotiation with the United

5  States?

6         THE DEFENDANT:  Yes, Your Honor.

7         THE COURT:  Okay.  Now, I told you before --

8     Excuse me guys, I'm sorry.

9     (Pause in proceedings.)

10        THE COURT:  One of the discussions we would have

11 would be the difference between proceeding by Information and

12 the difference between proceeding by Indictment.

13    Unless you waive the right to have the case presented to a

14 grand jury, then the United States has to proceed by

15 processing the case with the grand jury and trying to seek an

16 Indictment.  A grand jury is composed of at least 16 people,

17 and there could be as many as 23 people present during any

18 type of a hearing.  At least 12 of those present must find

19 that there was probable cause that you believe that a crime

20 was being committed and that you were the person that

21 committed the crime before an Indictment was returned against

22 you.

23    In other words, what would happen is:  those people would

24 meet in a room; there would be a United States Attorney

25 present; they would present testimony in this case likely from

1    the agents that are in the courtroom today; this grand jury

2    would hear that and decide whether or not that there was a

3    crime that was committed and whether or not you are the person

4    that committed the crime.

5        Now, a grand jury might indict you or it might not indict

6    you.  If you waive your right to Indictment by a grand jury,

7    then this case will proceed based upon the paper Information,

8    which we've already discussed, just as though you had been

9    indicted.  In other words, there would be the three charges

10   you will be facing in Counts One, Two and Three of the

11   Information.

12       Do you understand that, Munir?

13           THE DEFENDANT:  Yes, Your Honor.

14           THE COURT:  Okay.  Now, just like an Indictment, with

15   an Information you have the right to plead not guilty, and you

16   can demand a trial on the Information.  If we had a trial, it

17   would be in open court.  You would be represented by counsel.

18   In this case, it would be Richard.

19       Richard would do a number of things if there were a trial

20   that would inure to your benefit.

21       He would provide cross-examination, which means anybody

22   that would come in and attempt to testify against you, you

23   have the right to ask them questions under oath.  We call that

24   cross-examination.  In layman's terms, he would try to shake

25   their testimony.

1        If you thought that there were any witnesses that could

2    give favorable evidence and Richard could get those people

3    served with subpoenas, then the marshals would make sure they

4    showed up in court.

5        Anybody charged with an offense in this country has two

6    very important rights.  The first is, no one could make you

7    admit you committed a crime --

8        We'll talk about that in a minute.

9        -- and the second one is, if there were a trial, nobody

10    can make you testify.  In other words, Mr. Mangan couldn't

11    call you as a witness and ask you questions.  The only way

12    that could happen would be if you and Richard thought that it

13    was smart for you to testify.  Then Richard would put you on

14    the stand.  First he'd ask you questions, and then and only

15    then could Mr. Mangan ask you questions after you've waived

16    your right not to testify.

17        Do you understand that?

18            THE DEFENDANT:  Yes, Your Honor.

19            THE COURT:  Okay.  The government's burden of proof

20    in any criminal case is beyond a reasonable doubt.  There's

21    what's called a presumption of innocence.

22        Now, what does that mean?

23        Anytime we have a trial in this courtroom, whether it's a

24    civil case or a criminal case, I tell the jury every time we

25    take a break that they are not to really form an opinion or

1    decide a case based upon pieces of evidence.  In fact, I tell

2    them they have to keep an open mind until they've heard the

3    entire presentation, the arguments of the lawyers, and have

4    been instructed on the law by me.  I tell them only then can

5    they decide the case.

6        In a criminal case, I go a step further.  I say, "As a

7    matter of fact, in a criminal case you have to presume that

8    Munir is innocent unless or until all 12 of you get together

9    in the back of the courtroom after the case is concluded and

10   you decide that the government has met its burden by proving

11   each and every element to beyond a reasonable doubt."

12       That's called a presumption of innocence.  Okay?

13           THE DEFENDANT:  Yes, Your Honor.

14           THE COURT:  Okay.  I had mentioned before that nobody

15   could make you admit you committed a crime.  If, in fact, we

16   proceed through the Information process, one of the agents, or

17   else perhaps the United States Attorney, will read to me a

18   Statement of Facts.

19       After that Statement of Facts is read, I will ask you if

20   it's accurate.  And if you say, "Yes, Judge, it is," that, in

21   all likelihood, means you're admitting to the offenses

22   contained in each of the three counts of the Information.

23       Okay?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  Okay.  Do you have any questions about

1    proceeding on Indictment versus Information?

2              THE DEFENDANT:  No, Your Honor.

3              THE COURT:  Okay.  Do you think at this time you wish

4    to waive the right to have the case presented to a grand jury

5    and wish to continue with the Information as has been filed in

6    court?

7              THE DEFENDANT:  Yes, Your Honor.

8              THE COURT:  Richard, do you have a waiver in that

9    regard?

10             MR. SMITH-MONAHAN:  We do, Judge, and we've had the

11   chance to read it before court started.  With your permission,

12   I'll have him sign it now.

13             THE COURT:  Thank you.

14       Munir, if you agree with everything that you and I have

15   been talking about, then go ahead and sign that document which

16   means you are willing to waive your right to have the case

17   presented to a grand jury.  Okay?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  Okay.

20       (Defendant signing the document.)

21             MR. SMITH-MONAHAN:  Your Honor, Mr. Abdulkader has

22   executed the waiver form.

23             THE COURT:  Thank you.

24       Okay, Munir, I saw you sign this in front of me.  Just for

25   the record, above where it says "Defendant's signature," that

1    is your signature; correct?

2            THE DEFENDANT:  Yes, Your Honor.

3            THE COURT:  And Richard, leading up to this moment

4    you've had full conversations with Munir and advised him of

5    all of his rights as it relates to the presentation of a grand

6    jury and the risks and benefits of both; is that correct?

7            MR. SMITH-MONAHAN:  Yes, Your Honor.

8            THE COURT:  Okay.

9        Therefore, I'll accept the waiver.

10       Miss Crum will file this under seal with the rest of the

11   documents in the case.

12       I'll accept the waiver because I find that it's knowingly

13   and intentionally made, and he understands his rights to

14   proceed by grand jury versus Information and has decided to

15   proceed by Information.

16       Okay.  Now, a few moments ago, Munir, I said if we

17   proceeded by Information, just as if there was an Indictment,

18   you have the right to plead guilty or not guilty to the

19   Information.

20       Is it my understanding, based upon the conversations you

21   and Richard have had with Tim Mangan, that you wish to enter a

22   plea of guilty to Counts One, Two and Three of the

23   Information?  Is that correct?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  Okay.  Now, if you entered this plea of

1    guilty, you'll be waiving the constitutional rights we talked

2    about just a moment ago as it relates to your ability to have

3    a trial and all that.  Right?

4              THE DEFENDANT:  Yes.  Yes, Your Honor.

5              THE COURT:  Okay.  Now, you said that you and Richard

6    have had a conversation about the charges, but I want to go

7    through these with you for just a moment just to make sure.

8        And, guys, if I say anything incorrectly, please let me

9    know.

10       Okay.  Count One of the Information, which I had already

11   outlined, is the Attempted Murder of Government Officials, in

12   violation of 18 U.S.C. 1114.  That has a possible term of

13   imprisonment not to exceed 20 years.

14       Do you understand that?

15             THE DEFENDANT:  Yes, Your Honor.

16             THE COURT:  Okay.  A possible fine of up to a quarter

17   of a million dollars.  Do you understand that?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  Okay.  And it could be followed by a term

20   of supervised release up to the rest of your life.  We'll

21   discuss supervised release in more detail in a moment, but do

22   you understand that?

23             THE DEFENDANT:  Yes, Your Honor.

24             THE COURT:  Okay.  Anytime there is a conviction in a

25   criminal case, whether it's by plea or by jury trial, there is

1   a one-hundred-dollar special assessment for any count.  So for

2   the first count, there would be a one-hundred-dollar special

3   assessment.  Okay?

4            THE DEFENDANT:  Yes, Your Honor.

5            THE COURT:  All right.  Now, Count Two of the

6   Information is Possession of a Firearm in Furtherance of the

7   crime that was described in the first count.  This particular

8   charge carries a mandatory minimum of five years'

9   imprisonment.

10       Do you understand that?

11           THE DEFENDANT:  Yes, Your Honor.

12           THE COURT:  Okay.  The possible term of imprisonment

13  is up to life.  Do you understand that?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  The fine, again, is a quarter million

16  dollars.  Do you understand that?

17           THE DEFENDANT:  Yes, Your Honor.

18           THE COURT:  In this case, the term of supervised

19  release is not more than three years.  Again, we'll talk about

20  supervised release in a minute.  Okay?

21           THE DEFENDANT:  Yes, Your Honor.

22           THE COURT:  And because it's a count, there's a

23  one-hundred-dollar special assessment for that.  All right?

24  Do you understand?

25           THE DEFENDANT:  Yes, Your Honor.

1        THE COURT:  Thanks.

2    All right.  Now, Count Three is the supporting the Foreign

3  Terrorist Organization, as defined by the Secretary, and

4  that's a violation of 18 U.S.C. 2339B.  That could be a period

5  of imprisonment not to exceed 15 years.  Okay?

6        THE DEFENDANT:  Yes, Your Honor.

7        THE COURT:  A possible fine is $250,000 again.  All

8  right?

9        THE DEFENDANT:  Yes, Your Honor.

10        THE COURT:  And this one has the potential of

11  supervised release, like the first count, of up to life.

12  Okay?

13        THE DEFENDANT:  Yes, sir.

14        THE COURT:  And there's also the one-hundred-dollar

15  special assessment.

16    Now, the Plea Agreement states that there is no agreement

17  as to what the sentence will be, and we will have a further

18  discussion about that a little bit later, if that's all right

19  with you.  Okay?  But you understand that, in terms of the

20  record, there is no agreement as to what the sentence will be.

21  Okay?

22        THE DEFENDANT:  Yes, Your Honor.

23        THE COURT:  All right.  Now, if I go ahead and accept

24  the plea, it is possible that I could impose a sentence just

25  the same as if a jury found you guilty.  Do you understand

1    that?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  Okay.  Obviously, these are serious

4    felony charges.

5         I'm assuming he has no record; right?

6              MR. SMITH-MONAHAN:  No record, Your Honor.

7              THE COURT:  Okay.

8         But what happens now, and this applies in any type of

9    felony for any type of crime, you will become what's called a

10   prohibited person, which means you're not going to be able to

11   own, use or possess a firearm or dangerous ordnance, and not

12   just during the term of supervised release but for the

13   remainder of your adult life.  Okay?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  All right.  Also, there will be other

16   things that may come up.  I don't know what the long view

17   looks like, but there may be applications for jobs, benefits,

18   a number of things that might come up that have routine

19   questionnaires.

20        You've probably filled these out before on school

21   applications.  It says, "Have you ever been convicted of a

22   crime punishable by more than a year imprisonment?"  In other

23   words, it's a felony.

24        And from now on you're going to have to inform the asker

25   of that question that the answer is yes, you have a felony

1    conviction on your record.

2       Okay?

3            THE DEFENDANT:  Yes, Your Honor.

4            THE COURT:  Okay.  You understand that the weapon in

5    this case is going to be forfeited.

6       Is there anything else, Tim, that's going to be subject to

7    forfeiture?

8            MR. MANGAN:  Just the weapon, Your Honor.

9            THE COURT:  Okay.

10      So you understand that; right?

11           THE DEFENDANT:  Yes, Your Honor.

12           THE COURT:  Okay.

13      The way the other issues have come up, Richard, have you

14   discussed with Munir, in your judgment, the potential

15   ramifications in addition to the criminal penalties

16   themselves?

17           MR. SMITH-MONAHAN:  Yes, Your Honor.

18           THE COURT:  All right.

19      Let's talk about the sentence in this case.

20      In 1984, Congress passed the Sentencing Reform Act.  What

21   that did was, they created a calculus, sort of a formula for

22   how probation officers, lawyers and judges are to calculate

23   sentences in criminal cases.

24      What they did was, they included a number of things called

25   sentencing factors.

1      So what they do is, anytime there's a criminal conviction,

2   there is what's called a Base Offense Level, a number of

3   points assigned to an offense itself.

4      Then a number of things are looked at which can either add

5   to the calculation or detract from the calculation, things

6   like:  use of firearms; you know, is the person acting alone

7   or in concert with others; what's their role.

8      There's a number of things that may come into play.

9      But what happens is, at the end of the day the Probation

10  Department writes a presentence investigation report, Munir.

11  In that report, they take a look at each of the counts, and

12  they say, "Here's what the calculation should be for the

13  sentence in this case."

14     Up until about seven or eight years ago, somebody in my

15  position, if they had done the calculation correctly, would

16  have been obligated to impose a sentence in that calculated

17  guideline range.  Now the Supreme Court says that's where

18  judges should start.  And I could look at a number of other

19  things called the 18 U.S.C. 3553 factors and other things that

20  I think are relevant.

21     In the appropriate case, I could actually go below the

22  calculated sentence if I think it's appropriate and can

23  justify it in the report, or I could actually go above it as

24  long as I didn't exceed any maximum sentences in the case and

25  as long as I could justify it in the record.

1          The one thing I cannot do, absent agreement of all the

2     parties, is go below any type of mandatory minimum sentence.

3     We've already talked about the five years being out there.

4          Okay?

5          So I've got some latitude, but not a whole lot.

6          Usually the first thing I look at are any types of

7     agreements, and we'll discuss those a little bit later.

8          Okay?

9          But you understand that if you were to ask me right now,

10    "Judge, what kind of a sentence am I looking at?", I'd say

11    "Munir, all I can tell you is what the possible maximum

12    sentences are and what the mandatory minimum is.  Where it

13    shakes out aside from that I really don't know at this point

14    in time."

15         Are you okay with that?

16              THE DEFENDANT:  Yes, Your Honor.

17              THE COURT:  Okay.  Now, we talked about supervised

18    release.  Since you don't have any type of criminal record,

19    you've probably never been under any type of community

20    control.

21         But what happens is, upon a release from imprisonment, a

22    person is assigned basically a probation officer.  That

23    probation officer goes over a set of rules and regulations.

24    They come up with terms and conditions for supervised release.

25         Obviously, not committing any new crimes is the first and

1    foremost.  Not possessing firearms is always included.

2        Because of the nature of this offense, there may be

3    conditions such as access to computers and a number of things.

4    I can't even figure out what they may want to do or not do.

5        In any event, they do all of that, and then you have to

6    live under those terms and conditions.  All right?  If they

7    think there is a violation --

8        Sometimes it's something small, not reporting, or who

9    knows what.

10        -- sometimes they deal with it directly with you and your

11   lawyer in the first place, and other times they file an actual

12   violation report.  In that case, it comes to me.  I have to

13   figure out whether or not you have abided by the terms and

14   conditions of supervised release.

15        If the answer is you've not, that you've broken the terms

16   and conditions, then I have to decide what the appropriate

17   sanctions should be.  It can be anywhere from extending the

18   period of supervised release to just talking to you about it,

19   but many times it also results in the person who is in

20   violation of their release being sent back to jail for the

21   term of supervised release.  Okay?

22        So, at the end, I've got a fair amount of discretion in

23   that regard.  Okay?

24            THE DEFENDANT:  Yes, Your Honor.

25            THE COURT:  Okay.

1          THE COURT:  Tim, at this time I'm going to ask the

2   United States to put any particular items in the Plea

3   Agreement that either, if I've misstated, you can correct the

4   record; or, if you think they need to be spelled out in

5   addition to what I've said, you can do that for the record as

6   well.  Okay?

7          MR. MANGAN:  Sure.  Thank you, Your Honor.

8      With respect to the Plea Agreement, paragraph 1 sets forth

9   the defendant's rights to plead not guilty and have a trial.

10  He is agreeing to waive those rights and go forward with

11  pleading guilty to Counts One, Two and Three as described in

12  paragraph 2 of the Plea Agreement.

13      In paragraphs 3, 4 and 5 of the Plea Agreement, it sets

14  forth the maximum penalties for the counts, which the Court

15  has already addressed with the defendant.

16      In paragraph 4, it explains that the sentence will be

17  imposed by and is within the sole discretion of the Court.

18  There is no agreement as to what the sentence will be.  The

19  Court could impose the statutory maximum.  The defendant

20  understands that the guidelines are advisory and not

21  mandatory, although the Court is required to consider the

22  Sentencing Guidelines.  The defendant does not have the right

23  to withdraw his guilty plea if the Court imposes a sentence

24  that is higher than expected.

25      Paragraph 5 explains that the defendant is pleading guilty

1   because he is, in fact, guilty; and that the Statement of

2   Facts in this case that is attached to the Plea Agreement is

3   true and correct, is made a part of the agreement, and will be

4   submitted to the Court as evidence.

5       Paragraph 6 sets forth several non-binding Sentencing

6   Guidelines stipulations between the parties:

7       First, the defendant would be entitled to a two-level

8   reduction for acceptance of responsibility as provided in

9   Section 3E1.1(a).

10      And then if the Probation Office recommends the reduction

11  and the defendant timely complies with all requirements, the

12  government will recommend an additional one-level reduction

13  pursuant to 3E1.1(b) for acceptance of responsibility.

14      In addition, as to Count One, the Sentencing Guideline

15  applicable to the offense of Attempted Killing of a Government

16  Employee is Sentencing Guideline Section 2A1.5, which has a

17  Base Offense Level of 33.  Three levels are added for a victim

18  enhancement pursuant to Section 3A1.2.  Twelve levels are

19  added for a terrorism enhancement pursuant to Section 3A1.4.

20      As to Count Two, the Sentencing Guideline applicable to

21  the offense of Possession of a Firearm in Furtherance of a

22  Crime of Violence is Section 2K2.4.

23      As to Count Three, the Sentencing Guideline applicable to

24  the offense of Material Support of a Foreign Terrorist

25  Organization is Sentencing Guideline Section 2M5.3, which has

1   a Base Offense Level of 26.  Two levels are added for a

2   connection to a firearm or violence pursuant to Section

3   2M5.3(b)(1).  Twelve levels are added for a terrorism

4   enhancement pursuant to Section 3A1.4.

5          And in accordance with Section 3A1.4, the defendant is

6   automatically deemed to having a Criminal History Category of

7   VI.

8          These stipulations are not binding on the Court, and the

9   defendant understands that if the Court rejects any of these

10  stipulations, the defendant does not have the right to

11  withdraw his guilty plea.

12         Paragraph 8 of the Plea Agreement explains that the

13  defendant agrees to forfeit all rights, title and interest in

14  the AK-47 rifle that was purchased and possessed by him on or

15  about May 21st, 2015.

16         Paragraph 9 explains that the defendant has reviewed all

17  aspects of this case with his counsel and is satisfied with

18  his attorney's legal representation.  It states that the

19  defendant has had meaningful and satisfactory explanations

20  from his counsel concerning each paragraph of the Plea

21  Agreement, the rights affected by the Plea Agreement, and the

22  alternatives available other than entering into the Plea

23  Agreement.  And, after conferring with counsel, he has

24  concluded that it is in his best interest to enter into this

25  Plea Agreement in its entirety rather than to proceed to

1  trial.

2      Paragraph 10 explains that his guilty plea is freely and

3  voluntarily made and is not the result of force or threats or

4  promises apart from those set forth in the Plea Agreement.

5  There have been no representations by any agent or employee of

6  the government, or any other law enforcement agency, as to

7  what the final disposition in this matter should and will be.

8      Paragraph 11 explains the consequences if the defendant

9  were to violate the Plea Agreement, namely the government

10  could declare the Plea Agreement null and void, and the

11  defendant would thereafter be subject to prosecution for any

12  criminal violation including those set forth in the

13  Information.

14      Paragraphs 12, 13 and 14 set forth several additional

15  provisions, namely:  Under paragraph 13, if the guilty plea is

16  not accepted by the Court or later set aside, then the

17  government has a right to void the agreement.

18      Finally, at paragraph 15, it says that in the event the

19  defendant does not plead guilty or seeks to withdraw a guilty

20  plea or violates the terms of the Plea Agreement, that he

21  waives any protection afforded by Section 1B1.8(a) of the

22  Guidelines, Rule 11(f) of the Federal Rules of Criminal

23  Procedure, and Rule 410 of the Federal Rules of Evidence.

24      Any statements made by the defendant in the course of any

25  plea discussions, any proceeding under Rule 11 of the Federal

1    Rules of Criminal Procedure, or any cooperation with the

2    government will be admissible against him without any

3    limitation in any civil or criminal proceeding.

4            THE COURT:  Okay.  Richard, can you show Munir page 7

5    of the Plea Agreement?

6            MR. SMITH-MONAHAN:  We have, Your Honor.

7            THE COURT:  Munir, that looks like the same signature

8    that's on the Waiver of Indictment Form.  Is that your

9    signature?

10            THE DEFENDANT:  Yes, Your Honor, it is.

11            THE COURT:  And did you sign that because you think

12    this contains the understanding you've reached with the United

13    States?

14            THE DEFENDANT:  Yes, Your Honor.

15            THE COURT:  And did you sign it because you actually

16    wish to plead guilty to Count One of the Information?

17            THE DEFENDANT:  Yes, Your Honor.

18            THE COURT:  And do you wish to plead guilty to Count

19    Two of the Information?

20            THE DEFENDANT:  Yes, Your Honor.

21            THE COURT:  And do you wish to plead guilty to Count

22    3 of the Information?

23            THE DEFENDANT:  Yes, Your Honor.

24            THE COURT:  Now, as to each of those counts, did

25    anybody make you any special promises or tell you that I would

1    treat the case a certain way just in order to get you to plead

2    guilty --

3              THE DEFENDANT:  No, Your Honor.

4              THE COURT:  -- or is this your own free and voluntary

5    act?  Okay.

6        Other than the fact that you may be facing I don't know

7    what in terms of sentencing, did anybody put any kind of

8    pressure, force or duress against you such that the plea that

9    you're attempting to enter today is not your own free and

10   voluntary act?

11             THE DEFENDANT:  No, Your Honor.

12                        * * *

13        (Proceedings filed separately under seal.)

14                        * * *

15             THE COURT:  All right.  Now the Statement of Facts.

16             MR. MANGAN:  Special Agent Sherry Driessen will read

17   the Statement of Facts, Your Honor.

18             THE COURT:  Richard, do you have any objection to the

19   agent reading it in an unsworn fashion or would you prefer

20   that she be sworn?

21             MR. SMITH-MONAHAN:  I have no objection, Your Honor.

22             THE COURT:  Are you okay with that, Tim?  Do you want

23   it unsworn?

24             MR. MANGAN:  That's fine, Your Honor.

25             THE COURT:  Okay.

1      All right.  Agent, if you could state your full name,

2  spell your last name, give us duty assignment and then just

3  the facts, we'd appreciate it.

4           AGENT DRIESSEN:  Yes, Your Honor.

5      Sherry, S-H-E-R-R-Y, middle initial L, last name Driessen,

6  D-R-I-E-S-S-E-N.

7           THE COURT:  Thank you.

8           AGENT DRIESSEN:  And I'm a Special Agent with the

9  Federal Bureau of Investigation.

10           THE COURT:  Thank you.

11           AGENT DRIESSEN:  Statement of Facts.  At all times

12  relevant, Munir Abdulkader has resided in West Chester, Ohio,

13  the Southern District of Ohio.  He became a citizen of the

14  United States on September 22nd, 2006.  During 2014 and 2015,

15  Munir Abdulkader was a college student at a university in

16  Cincinnati, Ohio.

17      Beginning in at least July of 2014 and continuing to 2015,

18  Munir Abdulkader established and used Twitter accounts.  Using

19  his Twitter accounts, he posted statements, videos and other

20  content indicating his support for ISIL.

21      Munir Abdulkader posted an ISIL training video, lamented

22  that his cousin had died fighting for ISIL, stated that he

23  supported ISIL, expressed his desire to travel and join ISIL,

24  and expressed his desire to attain *shahada*, or martyrdom.

25      In January of 2015, Munir Abdulkader applied for a

1   passport and instructed that the passport be delivered to an

2   address that was not his residence.

3       From approximately March 2015 to mid-April 2015, he began

4   speaking with a Confidential Human Source, (CHS), about his,

5   Munir Abdulkader's, desire and intention to travel to Syria in

6   order to join ISIL as a fighter.

7       From approximately March 2015 through at least April 2015,

8   Munir Abdulkader made plans and preparations to travel to

9   Syria to join ISIL as a fighter.  He expressed his support for

10  ISIL, expressed his intent to become a fighter for ISIL,

11  secured a passport, saved money for the trip, and researched

12  the logistical details of traveling to and joining ISIL.

13      In approximately late April of 2015, he expressed concerns

14  about the number of arrests of individuals who were trying to

15  travel to join ISIL.  He researched other options and

16  postponed his original departure date of approximately May

17  2nd, 2015.

18      During at least May 2015, Munir Abdulkader was in

19  electronic communication with one or more individuals located

20  overseas whom he understood were members of ISIL.  Through

21  those communications, the persons whom he understood were

22  members of ISIL directed and encouraged Munir Abdulkader to

23  plan and execute a violent attack within the United States.

24      In May 2015, Munir Abdulkader began discussing with the

25  CHS the possibility of executing a violent attack within the

1  United States.  Munir Abdulkader discussed an idea of

2  attacking a police station, which, according to Munir

3  Abdulkader, had been declared a permissible target by an ISIL

4  cleric.

5      Munir Abdulkader then communicated with the CHS and

6  overseas members of ISIL about a plan to attack a military

7  base and/or kill an identified military employee on account of

8  his position with the United States government.

9      The plan included abducting the employee at the employee's

10  home and filming the execution of the employee.  After killing

11  the employee, Munir Abdulkader planned to execute a violent

12  attack on a police station in the Southern District of Ohio

13  using firearms and Molotov cocktails.

14      In preparation for the attack, Munir Abdulkader took the

15  following actions:

16      a.  Munir Abdulkader asked the CHS to purchase a vest for

17  holding ammunition.

18      b.  On or about May 18, 2015, Munir Abdulkader traveled to

19  a police station in the Southern District of Ohio and

20  conducted surveillance of the police station.

21      c.  On or about May 20th, 2015, Munir Abdulkader went to a

22  shooting range, learned how to operate certain firearms, and

23  practiced shooting the firearms.  Munir Abdulkader also

24  negotiated the purchase of a firearm, namely an AK-47 assault

25  rifle, for $350.

1          d.   On May 21st, 2015, Munir Abdulkader provided funds for

2    the purchase of an AK-47 assault rifle and took possession of

3    the firearm.

4               THE COURT:  Munir, again, it looks like your

5    signature is on that.  There is a statement that says you have

6    reviewed those statements and you agree that they are

7    accurate.

8          Did you sign that document because it is accurate?

9               THE DEFENDANT:  Yes, Your Honor.

10              THE COURT:  Is it incorrect or inaccurate in any way

11   that you think you need to tell me about at this point in

12   time?

13              THE DEFENDANT:  No, Your Honor.

14              THE COURT:  Then can I understand that you are

15   offering to plead guilty to the first count, second and third

16   counts of the Information because you did commit the offenses

17   that are charged in those particular counts?

18              THE DEFENDANT:  Yes, Your Honor.

19              THE COURT:  All right.  Now, we've had a number of

20   discussions about your right to proceed by Information versus

21   Indictment, also your right to proceed by plea versus a jury

22   trial.  You previously indicated you wish to give up your

23   right to a jury trial and proceed by the guilty plea.  Is that

24   correct?

25              THE DEFENDANT:  Yes, Your Honor.

```
 1              THE COURT:  Okay.  In light of all the conversations
 2   I've had with you about your rights --
 3        This is the last time I'm going to ask you.
 4        -- how do you wish to plea to the charge in the first
 5   count of the Information, guilty or not guilty?
 6              THE DEFENDANT:  Guilty.
 7              THE COURT:  How do you wish to plea to the charge in
 8   the second count of the Information, guilty or not guilty?
 9              THE DEFENDANT:  Guilty.
10              THE COURT:  And how do you wish to plea to the charge
11   in the third count of the Information, guilty or not guilty?
12              THE DEFENDANT:  Guilty.
13              THE COURT:  All right.
14        Based upon my observations of Munir in court, his
15   appearance and the manner in which he has been answering the
16   questions that I've been asking, I'm satisfied that:  he's in
17   full possession of his faculties; he is not suffering from any
18   apparent physical or mental illness; he is not under the
19   influence of narcotics; he understands the proceedings in
20   which we're engaged; he's an educated man that understands the
21   nature and the meaning of the charges set forth in the three
22   counts of the Information; and, based upon the conversations
23   we've had about the Plea Agreement, he is aware of the
24   potential consequences of his plea of guilty.
25        And, obviously, because we have Plea Agreements, he is
```

1    aware of negotiations that were undertaken on his behalf.

2        Therefore, I find that the Waiver of Indictment and

3    proceeding by Information is a knowing and voluntary and an

4    intelligently-made act.

5        I also find that each plea of guilty is a knowing and

6    voluntary plea supported by an independent basis in fact which

7    contains each of the essential elements that are set forth in

8    the Information pursuant to Counts One, Two and Three.

9        Therefore, I'll accept the plea and make a finding of

10   guilty.

11       Before we proceed any further, do you think I hit all the

12   technical aspects I need to?

13            MR. MANGAN:  Yes, Your Honor.

14            THE COURT:  And we're clear that he's acknowledging

15   he wishes to plead guilty and enter a plea of guilty on the

16   record; correct?

17            MR. SMITH-MONAHAN:  Yes.

18            THE DEFENDANT:  Yes, Your Honor.

19            THE COURT:  All right.

20       So here's the deal.  I'm not sure what's going to happen

21   because this case is under seal.  I'm just guessing there may

22   be other workings that are going on.  But, in due course, the

23   probation officer will be contacting you to get background

24   information in terms of a presentence investigation.

25       Munir, any time you talk to the probation officer about

1    that, Richard should be with you.  Okay?

2         THE DEFENDANT:  Yes, Your Honor.

3         THE COURT:  Make sure your lawyer is with you.

4    They'll set up an appointment, and Richard knows how to do

5    that.

6       That information they get from you guys, together with the

7    information they get from the United States Attorney's Office,

8    they will write that presentence report we talked about.  They

9    may or may not reference the items that we've also been

10   talking about off the record in the report, but those will be

11   considered.

12      In any event, if what they have inside the report that you

13   guys have issues with, both sides are allowed to object to

14   various findings that the Probation Office makes.

15      Usually what happens is, the lawyers will call the officer

16   in the first instance, see if they can work it out.  If they

17   can, they can, and that's fine.  If they can't, then both

18   sides have the right to file formal objections to what's

19   contained in the presentence investigation.

20      And I typically deal with that just prior to the

21   sentencing itself unless it's more complicated.

22      Is that okay?  Do you understand that?

23        THE DEFENDANT:  Yes, Your Honor.

24        THE COURT:  Okay.  So that will be -- as far as I

25   know, that will be the next step for you.

1        Now, my understanding was also that Munir was being held

2   under, I think, what, a temporary detainer, Barb?

3             COURTROOM DEPUTY:  From the magistrate judge, yes.

4             THE COURT:  From the magistrate judge.  So at this

5   point in time do I, what, just order him into the custody of

6   marshals?

7             MR. MANGAN:  Your Honor, the magistrate had

8   previously ordered him detained.  But as far as a detention

9   hearing, the defendant had waived the time parameters for that

10  and periodically entered into those waivers in terms of having

11  a detention hearing.  I think we're probably now at a point

12  where the Court could just enter a detention order, unless the

13  defendant feels differently.

14            THE COURT:  Richard?

15            MR. SMITH-MONAHAN:  No objection to that.

16            THE COURT:  Okay.  Well, based upon everything that's

17  in front of me, the documents in front of me and the admission

18  and the plea of guilty in this case, my order would be that he

19  be remanded to the custody of the United States Marshals

20  pending the sentencing in this case without bond.

21       And I don't think there's any exceptional circumstances

22  that I know of.  I mean, he's just being held; right?

23            MR. MANGAN:  That's correct.

24            THE COURT:  In the routine fashion?

25            MR. MANGAN:  Yes.

```
 1              THE COURT:  Okay.  All right.

 2       So Munir, do you have any questions you want to ask me

 3  before we conclude this morning's proceedings?

 4              THE DEFENDANT:  No, Your Honor.

 5              THE COURT:  All right.  Are you satisfied with the

 6  conversations we've had about the Plea Agreement and about

 7  your various rights?

 8              THE DEFENDANT:  Yes, Your Honor.

 9              THE COURT:  And are you satisfied with Richard's

10  advice and representation in this case?

11              THE DEFENDANT:  Yes, Your Honor.

12              THE COURT:  Okay.  So what we've done here is, in

13  fact, knowingly, voluntarily and intentionally done as I

14  previously entered on the record; right?

15              THE DEFENDANT:  Yes, Your Honor.

16              THE COURT:  Okay.  All right.

17       So Marshals, you'll take custody of Munir, and we'll stand

18  in recess.

19       And you guys will notify us as to when we're coming back;

20  right?

21              MR. SMITH-MONAHAN:  Yes, Your Honor.

22              MR. MANGAN:  Yes, Your Honor.

23              THE COURT:  All right.  Is this going through the

24  normal process, six to eight weeks?  Is that where we are?

25              MR. MANGAN:  Yes, Your Honor.
```

1              THE COURT:  Okay.

2              MR. MANGAN:  I've already met with Probation to get

3      that going.

4              THE COURT:  So Munir, it usually takes six to eight

5      weeks before they get that paperwork done.  Okay?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  So we'll see you then.

8          All right.  Thanks, everybody.  We'll stand in recess.

9

10        (The proceedings concluded at 11:56 a.m.)

11

12

13

14                    C E R T I F I C A T E

15

16      I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

17  THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

18

19  S/MARYANN T. MAFFIA, RDR

20  Official Court Reporter

21

22

23

24

25