**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Case No. 1:16-CR-019 |
| | : | |
| v. | : | **SENTENCING MEMORANDUM** |
| | : | **OF UNITED STATES** |
| **MUNIR ABDULKADER** | : | |
| | : | Judge Michael Barrett |

**I. INTRODUCTION**

Defendant Munir Abdulkader (the "Defendant" or "Abdulkader"), acting pursuant to the specific instructions of the Islamic State of Iraq and the Levant (ISIL), plotted to murder a government employee simply because that employee proudly served the United States of America. Furthermore, Abdulkader planned to attack a police station in the Cincinnati area, using both explosives and firearms, in order to kill as many police officers as possible.

The Defendant has now pled guilty to all three counts in an Information. The Defendant admitted that he was guilty of attempting to murder government employees and officials, in violation of 18 U.S.C. § 1114 (Count 1), possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(Count 2), and attempting to provide material support to a designated foreign terrorist organization (ISIL), in violation of 18 U.S.C. § 2339B (Count 3).

Based on 18 U.S.C. § 3553(a) and the facts discussed below, the United States recommends a sentence of a total of 25 years of incarceration (300 months).  This can be accomplished by sentencing the Defendant to: (1) 240 months for Count 1, which is the statutory maximum; (2) 180 months for Count 3, which is the statutory maximum, to be run concurrently with Count 1; and (3) 60 months for Count 2, which must run consecutively to the sentences for Counts 1 and 3.  The government requests a lifetime period of supervised release and forfeiture of the AK-47 rifle.

## II. THE SENTENCING PORCEDURE POST <u>BOOKER</u>.

After the Supreme Court's landmark decision in *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing Guidelines are advisory, and judges must now impose sentences in accordance with 18 U.S.C. § 3553(a), which describes the factors to be considered. However, a district court must first use the Guidelines to calculate a Defendant's sentencing range and consider the range when devising a sentence. *Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 596 (2007). After calculating the advisory Guidelines range, the court must consider that range along with all the factors listed in 18 U.S.C. § 3553(a) before arriving at the final sentence. These factors include the following:

> (1) the nature and circumstances of the offense and the history and characteristics of the Defendant;
>
> (2) the need for the sentence imposed--
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the Defendant; and
>>
>> (D) to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) . . . the sentencing range established . . . [by the Guidelines];
>
> (5) any pertinent policy statement . . . issued by the Sentencing Commission . . . that . . . is in effect on the day of sentencing[;]
>
> (6) the need to avoid unwarranted sentence disparities among Defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

**III.     NATURE OF THE OFFENSE.**

Although no one sentencing factor is controlling, the nature of this offense is so critical and disturbing that it requires an extensive discussion.  Simply put, the Defendant placed himself under the direction and control of a pernicious foreign terrorist organization and plotted with that organization to conduct multiple murderous attacks in the Cincinnati area.  The Defendant, before he had contact with the Federal Bureau of Investigation's (FBI) confidential source (discussed below), established and used Twitter accounts to repeatedly post statements, videos, and other content indicating his support for ISIL.   The Defendant's initial support of ISIL was not limited to the spreading of its venomous calls to violence; rather he undertook concrete actions to aid ISIL.  Specifically, he sought to travel abroad to join ISIL's murderous gangs, applied for a passport and, in order to partially mask his plotting, instructed that the passport should be delivered to an address other than his own actual residence.

Throughout early 2015, after the Defendant's ISIL Twitter postings became known to the FBI, Abdulkader told an FBI confidential source about his intention to travel to Syria in order to join ISIL as a fighter.  Abdulkader made plans and preparations to travel to Syria to join ISIL, including saving money and researching the logistical details of joining ISIL.  However, in late April 2015, he expressed concerns about the increasing number of individuals who were arrested for trying to travel to join ISIL, so he postponed his plans to become an ISIL foreign fighter.

During this time, Abdulkader was in electronic communication with at least one member of ISIL overseas named Junaid Hussain, and placed himself under the direction of ISIL and its overseas leadership.  Through his communications with Hussain, Abdulkader plotted and planned to execute a violent attack within the United States.  The plan was for Abdulkader and the source to murder a specific employee of a military base. This murder was to occur at the

3

employee's home.  Additionally, to further ISIL's cause, the Defendant planned to videotape the murder so that it could be used in an ISIL propaganda video.  Following the murder, Abdulkader and the source would then launch a violent attack on a police station in the Cincinnati area.

In preparation for the attacks, Abdulkader conducted surveillance of the police station, received a targeting package about the victim, went to a shooting range, learned how to operate certain firearms, and practiced shooting the firearms.  He also bought an AK-47 assault rifle for the attack.  We will now discuss the chilling evidence of the Defendant's criminal acts.

   A.  **The Defendant's Twitter Accounts.**

As noted above, Abdulkader created a Twitter account that was posted under the name "Ibn Abdulkader" which he used to spread ISIL's message of hate.  For example, when ISIL declared a caliphate in the summer of 2014, Abdulkader enthusiastically expressed his support for ISIL and its methods:

**September 19-21, 2014:**[1]


Ibn Abdulkadir · Sep 20
Britain will fall to the Khilafah, US will fall to the Khikafah, along with Russia, China, Israel, Arabia, Jordan, Sham, world Bi'ithnillah!


Ibn Abdulkadir · Sep 19
It's Jumm'ah, No College for 2 days, Islamic State released 55 minute video. Can't wait to watch it later in high def huge flat screen TV!😎

---

[1] The term "Khilafah" is now used to mean the head of state for a Muslim nation or caliphate, in this case, ISIL.  The term "Jumm'ah" is a congretional prayer held by Muslims on Fridays.

4

**September 25-28:**



Ibn Abdulkadir · 31m
Whether you like it or not( Muslim or Non-Muslims), the Khilafah will rule the world & Sharia will be implemented W/our Amir Baghdadi (HA)!

These posts are merely a small sample of the nearly daily stream of pro-ISIL Twitter propaganda disseminated by the Defendant. Abdulkader retweeted pictures and videos from ISIL, made inflammatory posts himself, and engaged in debates and commentary with his Twitter followers.

Abdulkader also made repeated references in his posts to having two cousins who died fighting in Syria. He referred to them as "shaheeds," which is a term used to mean "martyr" or someone who died in battle fighting. Abdulkader eventually added a picture of his cousins as his avatar (i.e., the image accompanying his Twitter account) and expressed regret that he could not join them as a martyr. On one occasion, Abdulkader wrote: "I love my parents & family. I don't want to pay them with money after College, rather through the intercession of a Shaheed on that day!" He later added: "3 Shaheeds in my family, (another I'm unsure of). Ya Allah, continue your blessings on us with more Shaheeds in my family!!" This fixation with martyrdom underscores the seriousness of Abdulkader's later plans to commit the Ohio attack.

*References to Beheadings*. Throughout the postings, Abdulkader reposted pictures of beheadings by ISIL, copies of which we have not included in this pleading out of concern for the victims of ISIL. He also often expressed in writing his approval of the beheadings committed by ISIL, a brutality that he would later plan to attempt himself. The following are examples of the Defendant's enthusiastic support of ISIL's beheadings.

**August 24, 2014:**



**September 3, 2014:**



*Abdulkader Changes His Twitter Accounts.* On October 1, 2014, an online site called Vocativ published an article called "ISIS Supporters in America: The Jihadis Next Door?" (Exhibit A.) Without naming Abdulkader, the article described Abdulkader's online postings and relayed an interview with Abdulkader's mother. Shortly after the reporters spoke with Abdulkader's mother, Abdulkader closed his Facebook and Twitter accounts. (Ex. A, p. 3.) Abdulkader then created a new Twitter account in which he condemned journalists like those who contacted his family. The Defendant then resumed his support of ISIL.

This brush with the media was not the only event that should have deterred Abdulkader from pursuing this path. Earlier in the year, in April 2014, FBI agents interviewed Abdulkader's older brother and expressed concern about pro-ISIL statements on Twitter. (PSR, ¶ 28) Despite these warnings, Abdulkader's support for ISIL only intensified.

**October 13-14, 2014:**



6



**October 16-17, 2014:**[2]



**November 20-21, 2014:**[3]





**B. The Passport and Abdulkader's Plan to Travel to Join ISIL.**

By the beginning of 2015, Abdulkader had begun to formulate a plan to travel to Syria in order to join ISIL as a fighter. In support of this plan, Abdulkader submitted an application to obtain a passport, against the wishes of his parents. Knowing that he was obtaining the passport as part of his plan to support ISIL, Abdulkader made several misstatements on the application, including a lie about

---

[2] The term "Shahada" is an Islamic declaration of faith. It is often used on flags and banners used by ISIL.
[3] The term "Wallahi" means, "I swear to Allah." The term "Dawlah" (or "ad-Dawlah") is referred to as another name for ISIL. The term "Dua" is considered by Muslims as an act of supplication or worship.

7

his intended travel. Also, to hide his plans from his family, Abdulkader directed that the passport be mailed to the address of a friend. In an effort to disguise his intent to join ISIL's ranks of foreign fighters, Abdulkader began making misleading statements online about the purpose of his anticipated travel. For example, on January 14, 2015, he tweeted, "I get to see my grandparents soon. Been 16+ years. They're weak and dying. I'll be leaving country soon InshaAllah for 1 month."[4]

In late February 2015, Abdulkader switched his Twitter account again; and although the Defendant continued to post comments in support of ISIL, he did so less frequently than before.

### C. The Attack Plot.

In January 2015, a confidential human source for the FBI (the "source") met and slowly began interacting with Abdulkader. When Abdulkader told the source that he planned to travel to Syria to join ISIL, the FBI began recording the meetings between the source and the Defendant. Over the next several months, Abdulkader continued to meet the source and to discuss with the source the Defendant's plan to join ISIL. At one point, Abdulkader showed the source that he had obtained a voice mail from an online contact in ISIL with instructions on how to travel and successfully cross the border into the war zone. During early 2015, there were several well-publicized arrests in the United States of individuals who were planning to travel to join ISIL and this fact caused the Defendant to reconsider his plan to become a foreign fighter. Under instructions from the now well-known ISIL operative, Junaid Hussain, Abdulkader received instructions from Hussain that travel was too risky and that Abdulkader should consider a violent attack within the United States. These instructions included the suggestion that attacks on behalf of ISIL should be undertaken against

---

[4] The term "InshaAllah" means "God willing."

American military personnel. The plan to attack a military base was later switched to police stations, due to the heightened security at military bases.

*The Formulation of the Homeland Attack Plot*. During May 2015, Abdulkader and Junaid Hussain had numerous online discussions about a plan for Abdulkader and the source to conduct a violent attack here in the Southern District of Ohio. In this respect, on May 7, 2015, Abdulkader and the source discussed an attempted terrorist attack in Garland, Texas, and how the attackers were not properly trained.[5] Abdulkader stated that he had heard about this attack, after it had occurred, through his online contacts with ISIL, and implied that he wished to be properly trained so that he could conduct a successful attack. Abdulkader told the source that there were people waiting to launch attacks on behalf of ISIL in other states and that the Garland attack was just the beginning. Abdulkader then asked the source about the process of purchasing a gun, the cost for a bullet proof vest, and the source's thoughts about potential targets. Abdulkader explained that Hussain was suggesting military bases. Abdulkader discussed with the source the type of planning that the Garland attackers should have done and how Abdulkader needed to train with a firearm.

During the aforementioned meeting, Abdulkader bemoaned his inability to travel and stated once again that he wanted to be a martyr. The meeting concluded with a lengthy discussion about guns and the type of training that they would need in order to mount a terrorist attack in the United States. In order to further attack planning, Abdulkader and the source made plans to go to a shooting range to practice firing a weapon. Abdulkader added that he would discuss the attack over with Hussain, and would then get back to the source with a plan.

---

[5] On May 3, 2015, two gunmen attacked a Mohammed cartoon drawing event in Garland, Texas. One guard was wounded in the shooting before the two attackers were killed.

***The May 11th Attack Planning Discussion with an Overseas ISIL Operative***. On May 11, 2015, Abdulkader and the source met to discuss the options for an attack. At the same time, Abdulkader was electronically communicating with Hussain in the presence of the source. Because of the security for military bases an attack on a military base seemed less plausible, so Abdulkader repeatedly raised the idea of attacking a police station. They also discussed constructing pipe bombs, and during the conversation Abdulkader showed the source plans for constructing a pipe bomb. Abdulkader, referring to the Boston bombings, implied how easy it was to construct such bombs.

Regarding the police station attack, Abdulkader floated numerous ideas and questions to Hussain in written electronic communications. For example, Abdulkader wrote the following to Hussain on May 11th:

- *"Speaking about it., police station op it is."*
- *"Is that permissible?"*
- *"There's one like 30 minutes awa [away]."*
- *"Which you think akh?[6] For storming? We storming but want to use some kind of explosive"*.
- *"We want to use it somehow, during or before attack, while storming etc."*
- *"No. Just pipe bomb, the grenade to throw whilst storming police st."*

During this the meeting between the source and Abdulkader, Hussain ultimately laid out, through electronic communications, an overall terrorist attack plan for Abdulkader and the source to implement. Hussain's plan was for them to raid a soldier's home, behead him, record it, send the recording to Hussain. Once this attack was completed, the Defendant was to go to a police station, throw pipe bombs, engage the police officers with firearms, and then fight to the death. Hussain even

---

[6] "Akh" or "akhi" roughly refers to a "brother."

10

suggested wearing the soldier's uniform so that they could walk casually into the police station. Abdulkader told the source that he thought it was a good plan as they continued to discuss the details.

Abdulkader relied on Hussain to obtain personal information about the military employee who would be targeted, but Abdulkader provided his thoughts about the ideal type of soldier he should murdered by beheading. For example, Abdulkader wrote the following to Hussain:

- *"What about the address akh?"*
- *"And akh make it a soldier who invaded Iraq. Soldier from 2012 to present."*
- *"Make sure the soldier was in Iraq or Afghanistan."*
- *"The addresses, his name, info, etc."*
- *"He still stationed there akh or he back"?*
- *"Do you know his work schedule? When he home etc?"*

At one point, the Defendant told the source that, if his university were in session, there would be many members of the military there, and added that he could get uniforms so that they could impersonate members of the military. Abdulkader was adamant that he wanted Hussain to provide information about an actual soldier who had fought in Iraq or Afghanistan.

Later on May 11, 2015, after the source and Abdulkader had parted ways, Hussain sent a link to Abdulkader that contained personal information and pictures about the intended target of the attack. Abdulkader forwarded the information to the source. The source asked, "What do you think about him as a target?" Abdulkader responded that, "he's the one." <u>The source then asked, "[w]hat do you think about beheading him?" Abdulkader replied, "[o]nly way to send a loud message to the kuffs akh. After that, the rest of the plan [followed by emoticons of a revolver and a bomb]"</u> (emphasis supplied).

11

*Further Preparations to Murder the Soldier.* In the ensuing days, Abdulkader and the source continued to meet, and Abdulkader continued to communicate with Hussain. Specifically, Abdulkader wrote several follow-up questions to Hussain:

- *"Is this what Sh. Adnani and Amir Baghdadi, (HA), both said akhi"? (5/12/2015)*

- *"Do you have their speech about attacking police station etc"? (5/12/2015)*

- *"How do you make Molotov? You have link?" (5/13/2015)*

- *"And what's the knife to use? Sharpest?" (5/13/2015)*

- *"Ordering the vest etc then in shaa Allah. Even sooner if we can." (5/14/2015)*

On May 14, 2015, Abdulkader sent the source a link to a new speech that was released by ISIL. Abdulkader once again expressed his resolve to murder: "Yes with full conviction I've made my mind: we will go through with this" (emphasis added).

Later that day, Hussain provided Abdulkader with the home address of the soldier as well as the name of the victim's spouse. Abdulkader asked for confirmation as to where the employee served in the U.S. military and what the soldier was doing now. Abdulkader then discussed with Hussain a plan for doing reconnaissance of the military employee's house. Hussain provided Abdulkader with detailed tips for the reconnaissance. Abdulkader responded, "[w]e will hold them all, tied up with zipper tie. Very good for detaining and restraining. Isolate the kalb[7] from the family" (emphasis added). They continued to discuss the type of tape needed to cover the victims' mouths.

As preparations for the attack increased, the Defendant's passion for the plot increased as well. On May 16th, Hussain told Abdulkader that an ISIL soldier had been killed by a drone strike but observed that: "Soon we will send our special forces to raid their homes and kill them in their own

---

[7] The term "kalb" is the anglicized version of the Arabic word for "dog," which is considered an epithet in Arabic.

homes… It will hurt every single American." Abdulkader responded: "We just need more lone wolves here akh." Abdulkader later added, "I'm actually very excited for the confrontation in Shaa Allah" (which means "God willing"). Hussain then told Abdulkader about his first "operation" and provided more words of encouragement.

On May 18, 2015, Abdulkader and the source met to discuss the attack plot, drove near the targeted police station, and traveled to a Walmart. While at the store, they looked at knives and discussed which knife would be best for the attack. Abdulkader selected one of the knives and confirmed that he could use it for the beheading. He even commented that his house knives would not be sharp enough. Abdulkader said that they would look suspicious purchasing it now, so they decided to wait and purchase it later, after they shaved their beards. That same day, Abdulkader wrote to Hussain: "We did recon on police station. Not much. Just feel of it."

In preparation for the attack, Abdulkader and the source, while under FBI surveillance to ensure the safety of the public, went to a private shooting range on May 20, 2015 to learn about weapons and practice shooting. After practicing to the shooting range, Abdulkader wrote to Hussain: "Whole new experience but did well. We used magnums, other pistols, m15 or m5 not sure, then Aks. I love it! Got the targets in face or [stomach]." Hussain commented that, "Next time ul be shooting kuffar [nonbelievers] in their face and stomach."

Abdulkader then told Hussain about his arrangements to purchase a gun. Abdulkader explained that he was buying an AK-47 rifle with no paperwork. In fact, Abdulkader had arranged through the source to purchase a gun to use in his attack. He purchased the AK-47 during a transaction in a parking lot. Abdulkader paid for the gun, took possession, and placed it in the car trunk. The FBI then arrested him immediately thereafter. Photographs of the firearm are below:

13





### IV. OTHER SENTENCING GUIDELINE FACTORS.

Pursuant to 18 U.S.C. § 3553(a), the Court, of course, must consider the sentencing guidelines range in fashioning the appropriate sentence. In this respect, the government concurs with the calculation of the sentencing guidelines reflected in the PSR.[8] The government anticipates that the final guideline range will be 262-327 months for Counts 1 and 3, with a minimum sentence of 5 years (60 months) for Count 2, the § 924(c) offense. The sentence must also consider the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the

---

[8] As explained in a separate briefing, the defendant's filing of the report by Marc Sageman may impact the acceptance of responsibility portion of the guidelines calculation.

law, and provide just punishment for the offense. The sentence must also afford adequate deterrence to criminal conduct and protect the public from further crimes of the Defendant. 18 U.S.C. § 3553(a).

The seriousness of this crime is apparent. The Defendant plotted to commit a violent attack that could have resulted in numerous deaths. The Defendant further plotted to commit one of the murders through cruel and barbaric means, and intended to do commit these murders as a symbolic attack on the United States as a whole. Furthermore, he aligned himself with a designated foreign terrorist organization, ISIL, that has called for the destruction of the West. ISIL has attempted to strike blows at the United States from within our own borders, and this case is a stark example of such plans. Had the Defendant been successful, lives would have been lost and ISIL would have used the attack as propaganda to recruit more people like the Defendant to commit even more atrocities. A sentence of 25 years of imprisonment for this plot reflects the seriousness of and provides just punishment for the crimes.

Finally, the Court should consider the impact of this case on the identified victim – the government employee who was selected by the Defendant and ISIL to be abducted and murdered. The FBI and other government authorities contacted the victim to inform him of the potential threat. The victim and his family were moved to a secured location until the Defendant's arrest. It is difficult to imagine the fear and uncertainty that accompanied such an intrusion into their lives, not to mention the thoughts of what could have been. Although the efforts of the FBI and JTTF were successful in keeping this person safe, it cannot be lost that an innocent American citizen in our district was targeted for murder at home solely on account of service to our country. This is a truly heinous part of the case that merits special consideration by the Court.

## V. SENTENCING RECOMMENDATION.

Based on the foregoing and the relevant § 3553(a) factors, the government recommends the Defendant be sentenced for all three counts to a total of 25 years of incarceration (300 months). The government recommends that this be accomplished by sentencing the Defendant to: (1) 240 months for Count 1, which is the statutory maximum; (2) 180 months for Count 3, which is the statutory maximum, to be run concurrently with Count 1; and (3) 60 months for Count 2, which must run consecutively to the sentences for Counts 1 and 3. The government also requests a lifetime period of supervised release. Lastly, the government requests forfeiture of the AK-47 rifle purchased by the Defendant on May 21, 2015.

        Respectfully submitted,
        BENJAMIN C. GLASSMAN
        United States Attorney

        s/Timothy S. Mangan
        TIMOTHY S. MANGAN
        Assistant United States Attorney
        221 East Fourth Street, Suite 400
        Cincinnati, Ohio 45202

        Michael Dittoe, Esq.
        U.S. Dept. of Justice
        National Security Division
        950 Penn. Ave. N.W., Room 2740
        Washington, DC 20530

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Sentencing Memorandum was served this 10th day of November, 2016 by ECF on all counsel of record.

s/Timothy S. Mangan
TIMOTHY S. MANGAN (069287)
Assistant United States Attorney
