**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No. 1:16-CR-019** |
| | : | |
| **v.** | : | **MEMORANDUM OF UNITED STATES** |
| | : | **OPPOSING DEFENDANT'S** |
| **MUNIR ABDULKADER** | : | **EXPERT REPORT** |
| | : | |
| | : | **Judge Michael Barrett** |

A. <u>**Introduction**</u>

Defendant Munir Abdulkader (Defendant) has filed what purports to be an expert's report, prepared by Marc Sageman, M.D. (the "Sageman Report"), to address issues concerning the appropriate sentence for the Defendant. However, the type of expert report rendered by Sageman is unclear, indeed the report fails to set out the author's qualifications and further fails to specify what type of expert opinion is being given. On the one hand, Sageman, a medical doctor, does not give a medical or psychological diagnosis of the Defendant; while on the other hand he does not supply background information related to the Islamic State of Iraq and the Levant (ISIL) that would provide the Court with information that could affect the appropriate sentence. Instead, Sageman, who is a psychiatrist and not an attorney, appears to simply assert that, "by setting [the Defendant] up via the [confidential human source] and arresting him, the FBI did not make the United States safer from terrorism." (Sageman Report, p. 2) As we will demonstrate, this quasi-legal conclusion by a non-lawyer should be given no weight. Furthermore, Sageman's conclusion is based on a false factual premises—indeed the evidence shows that the Defendant was in contact with the well-known, and now deceased, ISIL operative Junaid Hussein well before being contacted by the CHS. The FBI's prompt intervention in this case prevented the Defendant from murdering and beheading a member of the United States military as he was directed to do by ISIL.

Additionally, given the assertion by Sageman that the Defendant had been "set up" by the FBI, the Court, as a matter of prudence, should inquire whether the Defendant is now questioning his guilty plea as a consequence of the Sageman report.   Furthermore, if the Defendant persists with Sageman's argument about being "set up," the Court must also consider whether he has accepted responsibility for guidelines purposes.

In conclusion, and as described in more detail below, the Sageman Report should be given no weight by this Court because:

1. The Defendant has admitted the offense, so the concept of entrapment is irrelevant;

2. The Court does not need an expert to reinterpret the undisputed facts in the PSR;

3. Even under entrapment law, the report is not a viable expert opinion;

4. The author of the report, Sageman, has an admitted bias in that he believes <u>all</u> investigations using informants constitute entrapment;

5. The report ignored certain critical facts, and misstated others; and

6. The author's assessment of the Defendant's dangerousness is flawed.

**B.   <u>The Sageman Report impacts the Defendant's plea and sentencing guidelines</u>.**

The Sageman Report does not state the author's qualifications, the purpose of the report, or what makes the report an "expert opinion."  However, it is clear in the introduction and conclusion that Sageman believes that the Defendant was "set up," or entrapped.  First, the Defendant appears to be raising a purported substantive defense to the crime at sentencing.  When a Defendant has pleaded guilty and admitted to the facts (at the plea and in the PSR), a substantive defense of entrapment is waived. *United States v. Hammadi*, 737 F.3d 1043, 1049 (6th Cir. 2013).

Second, by asserting that he was "set up," the Defendant is essentially contradicting his statement of facts and denying guilt.  The defense cannot have it both ways.  And the government

2

does not want to see this tactic raised as an affirmative argument in an appeal or habeas corpus petition.  Therefore, to clarify the record, the Court <u>should inquire whether the Defendant is seeking to withdraw his guilty plea and assert his innocence under this entrapment theory, or whether he will withdraw this argument and reaffirm his guilt</u>.

Further, the Court must consider whether the defense's position in the Sageman Report negates the Defendant's acceptance of responsibility credit under § 3E1.1 of the Sentencing Guidelines.  Prior to the Sageman Report, the government had no objection to the 3-level reduction for acceptance of responsibility.  However, "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." U.S.S.G. § 3E1.1, Application Note 1(A).   In addition, a timely guilty plea and admission in favor of acceptance "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility."  U.S.S.G. § 3E1.1, Application Note 3.  By making an argument that he is not culpable for his conduct, the Defendant is taking a position that is incompatible with acceptance of responsibility under § 3E1.1.

### C.  <u>Even if this were a trial, the Report is not a proper expert opinion.</u>

The Sageman Report mainly comments on the Defendant's interactions with the government's source (the "source"), saying that they "relate to the 'predisposition' of the Defendant to commit the crime in entrapment or sting operations." (Sageman Report, p. 2.)  As explained above, such an argument at sentencing after a guilty plea is irrelevant and should receive no weight.  However, even in the context of a trial, the Sageman Report would not be a proper expert opinion for the substantive defense of entrapment.

An entrapment defense requires proof of two elements: "(1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to engage in the criminal activity."

*United States v. Khalil,* 279 F.3d 358, 364 (6th Cir. 2002); *see also*, *United States v. Al-Cholan*, 610 F.3d 945, 950 (6th Cir. 2010). Predisposition is "the defendant's state of mind before his initial exposure to government agents." *United States v. Johnson,* 855 F.2d 299, 303 (6th Cir.1988); *United States v. Kussmaul*, 987 F.2d 345, 348 (6th Cir. 1993).

Expert medical opinions on the susceptibility to inducement have been permitted to a limited degree. *United States v. McLernon*, 746 F.2d 1098, 1115 (6th Cir. 1984) (in dicta, expert testimony concerning predisposition may be permitted). Although the Sixth Circuit has not set forth a standard, other districts have held that such medical testimony is limited to the diagnosis of mental deficiencies that create particular "susceptibility to inducement." For example, in the Fifth Circuit, expert testimony is admissible only to demonstrate that a mental disease, defect or subnormal intelligence makes a defendant peculiarly susceptible to inducement. *United States v. Newman*, 849 F.2d 156, 165 (5th Cir. 1988); *see also*, *United States v. Sandoval-Mendoza*, 472 F.3d 645, 656 (9th Cir. 2006) (allowing medical opinion that a medical condition renders a person unusually vulnerable to inducement); *United States v. Dennis*, 826 F.3d 683, 692 (3d Cir. 2016) (used expert testimony of defendant's vulnerability to being persuaded due to his low IQ).

Here, the Sageman Report does not provide a medical diagnosis at all. There is no medical opinion that Abdulkader had mental deficiencies – to the contrary, he is quite intelligent. Sageman did not render a psychiatric opinion at all, nor did the defense provide notice of any psychiatric opinion. Sageman merely interviewed Abdulkader once and reviewed the discovery. No psychological testing was conducted. No health records were consulted. And no such opinion about Abdulkader's mental capacities was rendered. So, even at trial, this would not pass muster as a proper expert opinion on a mental condition impacting susceptibility. Thus, the Court can disregard it.

Moreover, if this were a trial, the report provides an impermissible opinion as to the ultimate issue. An expert may not offer an opinion on the ultimate issue of whether a defendant was induced to commit a crime or lacked predisposition. Fed.R.Evid. 704(b); *United States v. Lueben,* 812 F.2d 179, 184 (5th Cir.1987). Thus, Sageman's conclusions should be afforded no weight.

**D.** **The Court does not need an "expert" to reinterpret the offense conduct in the PSR.**

The Court should consider the overall propriety of this tactic by the defense bar in the context of Presentence Reports. With the Sageman Report, the defense has asked an outside individual to read the discovery and provide loose commentary on what happened. The report begs the question – what is the purpose of the opinion? And does the Court need another person to understand the facts and the Defendant's statements? If the Defendant has any quibble with the accuracy of the facts in the PSR, he can raise objections to the Probation Office and later to the Court. The Defendant has not raised any such objections to the PSR, including the factual summary in the PSR. Instead of following that process, the defense has provided an alternate "factual summary" through this report. In one respect, this tactic is akin to the defense hiring an outside person to write a private, biased Presentence Report and then passing it off as an "expert" opinion. That would set a dangerous precedent.

**E.** **Sageman's admitted bias against informants.**

The Court should also give no weight to the Sageman Report because of Sageman's stated bias and opinion that <u>all</u> terrorism investigations involving sources or informants involve entrapment.

This view is explained in Dr. Sageman's recently-published book entitled <u>Misunderstanding Terrorism</u>, University of Pennsylvania Press (2017), in which he posits that the threat of violent

terrorism in the West is overstated and inflated.[1]  Within his analysis in the book, Sageman categorically rejects and refuses to consider any cases or data based on investigations using informants.  Misunderstanding Terrorism, page 26. Having stated categorically -- and before reviewing the evidence – that all use of informants in these investigations is invalid, the report should be given no weight at all.

Sageman justifies his position with a sweeping statement that, in all the cases involving an informant that he reviewed, "the defendants posed no real threat of violence because they had no capability or realistic hope of carrying out an attack.  State agents made all the obstacles in the way or carrying out attacks disappear and supplied weapons to these helpless militants, who posed no danger to the public.  I therefore excluded sting operations from the survey."  Misunderstanding Terrorism, page 26.  Thus, with one wave of his hand, Sageman rejects all violent plots prevented through informants.  In his mind, the violent attacks that occur are real, but disrupted violent attacks are not.

Sageman repeated this opinion throughout the book.  He wrote:

- "Government analysts are also hindered by politics.  They must include people convicted in FBI sting operations as true terrorists, while the evidence indicates that, but for the FBI informant or undercover agent, they would have never turned violent."

- "[W]hen there is not enough evidence to arrest someone, legions of confidential informants or undercover agents set up credulous suspects in sting operations."

- "In all these sting operations, the FBI provided the means to carry out an attack, and the entrapped individuals lacked the ability to carry out any attack.  The vast majority of arrests were therefore not for a threat of violence on the homeland."

Misunderstanding Terrorism, pages, 21, 22, and 74.

---

[1] The book contains a data analysis pertaining to attacks in the decade between 9/11/01 and 9/10/11. Misunderstanding Terrorism, page 25. It therefore excludes the violence related to ISIL (or Daesh) over the past three years.  It also excludes any cases involving informants.

Sageman even criticizes the use of conspiracy and material support charges against potential terrorists, claiming that the law "allows entrapment of naïve Muslim militants into committing crimes that would never have occurred absent FBI inducement." <u>Misunderstanding Terrorism</u>, page 56; *see also*, <u>id.</u> at page 93 (again referring to the "many naïve Muslims caught in FBI sting operations"). He claimed that the defendants in such investigations were "naïve" "victims" who "would probably not have participated in violence." <u>Misunderstanding Terrorism</u>, page 170.

Thus, Sageman has a fixed, immutable opinion on all investigations involving informants. He reached his entrapment conclusions before he ever reviewed the evidence in this case. Moreover, Sageman has now staked his reputation on that opinion, having written these broad conclusions in a new book that was released in October 2016. Faced with that fixed world view, the evidence was irrelevant to Sageman. He simply concluded that the Defendant's case fit the theories and conclusions in his book.

### F. <u>The facts of this case also contradict Sageman's opinions on ISIL in the book.</u>

Sageman is also confronted with the uncomfortable fact that ISIL's direct instruction to Abdulkader contradicts some of the boldest statements in Sageman's new book, namely Sageman's provocative opinions about ISIL-inspired attacks. Sageman opines that "there has been a great deal of hysteria about Daesh [ISIL] in the United States despite the fact that not a single Daesh operative has yet been discovered in the country." <u>Misunderstanding Terrorism</u>, page 53. Sageman then takes his conclusions one step further to dispute any links between the recent violent attacks in the West and ISIL. He writes: "So far, there has not been any link between US homegrown plots carried out on behalf of Daesh and Daesh itself," including the San Bernadino and Orlando mass murders. <u>Misunderstanding Terrorism</u>, page 122.

In drafting his report, Sageman combined his bias against informants with his dismissal of connections between terrorist groups and individuals in the United States.  Sageman wrote: "FBI agents justify their sting operations by claiming, 'We got to the suspects before al Qaeda did.'" Misunderstanding Terrorism, page 78-79.  Sageman then refutes this straw argument, claiming it is "highly rare for a person in the U.S. to have direct contact with a terrorist organization."  Id.

This very prosecution, however, shows that Sageman's proclamations are not based on evidence, in fact, this case shows that his new book is wrong – dead wrong.  In this case in particular, Abdulkader did have direct contact with several members of ISIL, including Junaid Hussein.  Such contacts were initiated by Abdulkader – in fact, Abdulkader began communicating with Hussain more than a month before meeting the government source. (Sageman Report, p. 6-7.)  Abdulkader received clear direction and encouragement from ISIL, not only about the travel plans, but concerning the specifics of the violent attack plot in the United States.  Abdulkader was specifically tasked by Hussain and ISIL with killing an individual in the United States that was picked by ISIL with Abdulkader's input.

Sageman acknowledges that there have been violent attacks in Garland, Texas, San Bernadino, and Orlando, but he states that "no link has yet been found to Daesh [ISIL]," other than the perpetrators sending messages claiming allegiance to Daesh before the attacks.  Misunderstanding Terrorism, page 54.  However, the evidence in this case revealed to Sageman that this was not true.  Abdulkader said that he was told by Hussain that he (Hussain) had helped to prompt the Garland, Texas attack.  Once again, the undisputed facts in this case flatly contradict the boldest conclusions in Sageman's new book.  Therefore, Sageman was forced to try to discredit the government's investigation with a spurious opinion based on mischaracterizations of the evidence.  This report should receive no weight from the Court at sentencing.

8

### G. **The Sageman Report omitted many critical facts.**

The Sageman Report completely ignores the statements made by the Defendant on his Twitter accounts, particularly the inflammatory statements made by Defendant prior to ever meeting the CHS. Sageman was provided with the Twitter discovery, but he downplayed all of the Twitter activity, saying that the Defendant was simply "curious" and "retweeting videos." As summarized in the government's sentencing memorandum, that statement is completely inaccurate. The Defendant repeatedly expressed his personal support of ISIL and its methods, expressing a desire to join the group and achieve martyrdom. This conduct was entirely separate from the source and mostly predated the source's introduction to the Defendant.

In addition, Sageman describes Abdulkader as simply wanting to live in a "genuine land of Islam" and help defend the Sunnis. (Report, p. 6.) This gross oversimplification ignores the statements on Abdulkader's Twitter extolling the virtues of beheadings, expressing a desire to fight and help conquer more territory for the caliphate.

The Sageman Report does not mention that Abdulkader lied on a passport application in an effort to hide his plan to join ISIL. Abdulkader applied for the passport as part of his plan to travel to Syria, and made misleading statements on the document. The Sageman Report also failed to mention the Vocativ article and Abdulkader's subsequent changing of his Twitter account name to continue his support of ISIL.[2] Again, the passport lies and the changing of the Twitter accounts occurred <u>before</u> Abdulkader met the source, yet those facts are ignored by Sageman.

---

[2] It is not clear whether Sageman received this information and failed to comment, or whether he was unaware of these facts.

**H.  The Sageman Report contains factual inaccuracies and misleading statements.**

Sageman's report contains numerous misstatements and mischaracterizations with regard to the interactions between the source and Abdulkader.  It would not be possible (or productive) to provide an itemize list of every distortion in Sageman's version of the facts.  This memorandum would end up being twice as long as the report.  Suffice it to say, the Court should instead rely on the evidence submitted and the undisputed facts in the PSR.[3]  In the interest of brevity, the government has selected a few of the most pertinent issues to highlight Sageman's misstatements.

*Abdulkader's Travel Plans*.  Sageman distorts Abdulkader's original plans to travel to Syria to become an ISIL fighter – plans that started before he met the source.  Sageman claims that Abdulkader simply wanted to immigrate to live a "genuine land of Islam." (Sageman Report, page 6.) Actually, as explained in the PSR and the government's sentencing memorandum, Abdulkader spoke openly of wanting to fight on ISIL's behalf and achieve martyrdom.  Abdulkader was anxiously awaiting the arrival of his passport that he received in April 2015.  The transcripts show that Abdulkader was also the person who took the lead on pursuing the travel plans and logistics through his ISIL contacts.  In fact, Abdulkader played for the source a recording of a phone message Abdulkader received from one of his ISIL contacts that explained a strategy to get into ISIL's territory. Moreover, Abdulkader saved up his own money, obtained the passport by himself, conducted all the research on the travel options, and planned a May 2nd departure.

---

[3] As a simple example, the Sageman Report made a claim that the source "never wanted to meet [Abdulkader's] family." (Sageman Report, page 7.)  Not true.  For example, on April 21, 2015, Abdulkader explained that he needed to drop his car off at home for his mom, so the source offered, "I can go say hi to her if you want."  Thus, Sageman misstated even trivial facts.

10

***The Pivot Away from the Travel***.  Abdulkader eventually decided not to travel to Syria based on recent U.S. arrests of people trying to join ISIL.  Sageman claims, based on his interview with Abdulkader, that the source still insisted on traveling to Syria as the school year ended. (Sageman Report, p. 10.)  That is not true.

The transcripts show that, as they pulled back on the travel plans, both Abdulkader and the source talked about waiting and seeing what opportunities would present.  On April 16, 2015, when Abdulkader asked the source if he had purchased a plane ticket, the source said: "No I didn't buy it, I didn't buy it yet, that's what I'm waiting for you, I'm not gonna go unless you go Akhi…..at least now, even if you don't go, I'll, I'll eventually go and check things out for myself and see how things are and maybe volunteer or maybe do something like that, but as of right now May 2nd I'm definitely not going, if you're not going."  There was no pressure.  At the end of the meeting, the source asked to clarify where Abdulkader stood:

Source:         So what are you saying at this point? Just to clarify.

Abdulkader:    [UI]………..

Source:         Do you have a timeframe in mind? Like the summer?

Abdulkader:    [UI]………..*soon as possible, I really don't like living here ya know, I really wanna leave, cause dawla……..when, I don't know*.

At the next meeting, the source even talked about summer plans.  At one point, the source said: "Are you going to go to class next semester?  I might mess around and go to Xavier."  They talked about <u>if</u> they ever travel, not when.  Abdulkader said: "I know *if* we leave Insha'Allah, I won't tell anyone."  The source replied, "It's going to be a surprise *if* I go, you know what I mean?"

11

(April 21, 2015 transcript, emphasis added.)[4]  During the May 7, 2015 meeting, Abdulkader asked the source if he had made contact with Hussain.  The source said it had been a while and that he [the source] told Hussain that "we decided not to leave anytime soon unless we come up with a plan cause we're just waiting."  Thus, there was no pressure from the source as to any particular path – he was simply trying to stay in contact with Abdulkader and Hussain to be aware of any plans at home or abroad.

  ***Initiating the Homeland Attack.***  The Sageman Report (wrongly) concludes that the source was the person who "initiated and suggested to Mr. Abdulkader plans to carry out operations in the United States and go to a gun range for training."  (Sageman Report, page 38.)  Sageman claims that the first mention of a homeland attack was by the source on May 7, 2015, when the two were discussing the Garland, Texas attack.  (Sageman Report, page 18.)

  Actually, the first mention of an attack was by Abdulkader to the source on April 21, 2016.  At that meeting, the two had some discussion of guns and whether Abdulkader was interested in buying a gun when, for the first time, Abdulkader raised the idea of committing an attack in the United States.  It was Abdulkader who raised an idea of a homeland attack, unprompted, and

---

[4] Contrary to Sageman's conclusion, the source deliberately did not rush Abdulkader or apply pressure to any particular course of action.  As the April 21st conversation ended, the source stated: "Okay, well we've got a whole summer Inshallah.  I don't know when I'm going to come after class.  We'll have to think about ways to come down. Would you ever drive up to Columbus and hang out or not?"  He later added, "If we have important stuff, I'm just trying to think like how we're going to stay in touch when I'm not coming to school every day especially and I was saying if it's important, I'll come out here. I don't care about coming out here. We can talk or we can make let's, let's actually make it a point to meet like once every two weeks or something. Let's just try to do, to do something. We don't have to do anything, we can just hang out or do something like to just keep in touch and keep our minds refreshed about whatever we're planning to do."

mentioned the FBI as an aspirational target. Abdulkader was talking about guns when this exchange occurred:

Abdulkader: *I mean to be honest, the only time I would buy a gun is if I find something here.*

Source: Really?

Abdulkader: *FBI, their headquarters is far away so there's no point.*

Source: Where is that, where is that, the headquarters?

Abdulkader: *Headquarters? It is in ah, I think. I don't remember, it's kinda, it's like an eight hour drive from here.*

Source: Wow.

Abdulkader: *Yeah. I don't know, one man can't do that job. It's huge FBI Headquarters. It's huge.*

Source: That's crazy.

Abdulkader: *So, that's, that's not a job for one man. You need like*

Source: What like two men?

Abdulkader: *Hmm?*

Source: Two people?

Abdulkader: *That would suffice, but the best would be a minimum of six.*

Source: Six people?

Abdulkader: *Yeah, unless you're very good and you have experienced too, but it would suffice, but the best is six minimum, bare minimum.*

(April 21, 2016 Transcript.) Thus, Sageman is simply incorrect.

The attack topic resurfaced at the May 7, 2015 meeting, right after two individuals were killed when trying to attack a cartoon contest in Garland, Texas. It was an immediate topic of discussion. Abdulkader revealed that Hussain had directed the Garland attacks and that Hussain had told that fact

13

to Abdulkader. According to Abdulkader, Hussain claimed to have many more people ready to conduct more attacks in the United States and that Garland was "only the beginning." Abdulkader also told the source about a bombing of Syrian civilians he called the Syrian Massacre.

It is important to say a word about the source's situation. Throughout the meetings, the source was tasked to inquire about Abdulkader's plans and indicate his willingness to join any plot. The source was not to suggest a single target or plan himself, and the transcripts show that he did not do so. Given that Hussain and Abdulkader were privately communicating, it was all the more important to ask about their discussions. The source therefore asked Abdulkader what he was discussing with Hussain and what plans were being cultivated. In light of the Garland attack, it was not only proper but critically important for the source to ask Abdulkader about his intentions and plans, as well as about any plans that Hussain was suggesting. Nothing was suggested by the source.

Abdulkader and the source talked about the failure of the Garland attack due to poor equipment and training. The source asks an open-ended question, "where would you do that?" Abdulkader responded:

> Abdulkader: *I was talking to [Hussain]; he was telling me military bases but that too heavily guarded, I wouldn't...*
>
> Source: And they are trained, that's the thing... that's the big difference they are trained.
>
> Abdulkader: *Yeah, so right now I'm just trying to learn how it feels.*
>
> Source: Inshallah...if you can come up to Columbus we can make that happen, will you drive up to Columbus?
>
> Abdulkader: *Sure, when I'm off, yeah.*

Thus, the first mention of a military base came from Abdulkader, as a suggestion from Hussain.

14

Note also that Abdulkader suggested the desire for gun training in that exchange. Sageman claims that the source pushed the idea of going to a shooting range in the May, 2015 conversations. Actually, even before the exchange above, the topic was first discussed on April 21, 2015. On April 21st, Abdulkader asked the source many, many questions about guns. The source answered Abdulkader's questions and mentioned the shooting range he uses, to which Abdulkader offered: "Oh, we'll have to go there one, (UI) really shoot a gun so anxious." It is clear from the exchanges that Abdulkader was, in his words, "so anxious" to learn about and receive training in guns.

After talking about gun safety during the May 7th meeting, the source naturally returned to Hussain's suggestion to attack a military base.

Source:    So you asked him where and he said military bases, he didn't say… he just said any military base?

Abdulkader:    *He gave me a couple military bases in Ohio.*

Source:    I know one is in my city, I don't know if there is one here.

Abdulkader:    *Police Station.*

Source:    He said that too?

Abdulkader:    [UI] *police station, government office without a doubt… he said the whole point is to hurt them, you know? He was talking about, I don't know what speech it was but he was talking about the Quran how it allows an eye for an eye, tooth for tooth.*

Source:    Damage for damage. . . So they are saying because of these civilians we want to kill 140 civilians?

Abdulkader:    *I'm no scholar but I agree, you know what I mean?*

Source:    I want it planned precise, like we have a certain target and we're gonna get that target… not just shoot guns that never shot before and then shot someone in the leg and then just get murdered, inshallah, Shaheed inshallah. [referencing to the Garland attack]

Abdulkader:    *It could have been better planned.*

15

Source:        Exactly.

Abdulkader:   *I just wish they would have gone to a range and actually learned how to use it.*

Sageman cites the source's comment above about being "planned precise" is the evidence that the idea of a homeland attack came from the source as retaliation for an alleged bombing of Syrian civilians. (Sageman Report, page 18, 40.)  That is simply not true.  First, the Source didn't even know about the bombing – Abdulkader explained the incident to him earlier in the conversation.  Second, in the context of the recent Garland attack, Abdulkader volunteered the different attack targets suggested by Hussain to Abdulkader.  Thus, the source did raise this idea.  The attack idea was from Hussain and the information about the Syrian bombing was from Abdulkader.

Later on, the source probed some more about Hussain's directions, asking: "Did he give you a plan?"  Abdulkader said no, but that Abdulkader was "not waiting on him and his call."  They discussed other topics including martyrdom, gun safety, gun practice, and the Christopher Cornell terrorism arrest.  The source asked again if Hussain provided a plan or whether they were expected to come up with one.  Abdulkader said he would have to ask about that but he thought that "we" [Abdulkader and the source] come up with the plan.  Abdulkader reasoned that, "We're responsible for seeing the perimeter, doing a little recon work stuff like that, cause they're not here to help out."

At this point, the only potential targets were the FBI (suggested by Abdulkader weeks earlier) and the military bases and police stations suggested by Hussain.  The conversation drifted through topics until Abdulkader spontaneously started discussing specific targets.  The source was talking about a Corvette as they looked at their phones when Abdulkader interjected with another target:

Source:        That's a corvette, that's a new one, that's like a 2015 Corvette and I would never put those kind of rims on there.

16

Abdulkader:      *I know right.*

Source:          I would just make it stock.

Abdulkader:      *Yeah of course we can't go to the Pentagon... That's like the question, where, you know what I mean?  That's highly guarded, you know what I mean, that's impossible unless you had PH or car bombs but that's too complicated.*

Source:          What makes it complicated?

Abdulkader:      *It's heavily guarded, especially the Pentagon, the FBI building, that's not even that high, their headquarters.*

Source:          Their headquarters is in New York or Washington.

Abdulkader:      *Yeah, something like that,,, I looked it up, it's pretty guarded also and the next best thing besides a military base is a police station. . . he said any government building or police station so those were options we were given... umm, I don't know, what do you think about that?*

Source:          That's okay but does that send the message that we want to send?  Cause police are signing traffic tickets they don't really care about IS.  Military, that might be something to think about, military or, I mean, I don't know any military bases around here, do you?
***
Abdulkader:      *So that was one of the options that [Hussain] gave me so, um, what do you think about that?  Compared to a police station.*

Eventually, Abdulkader says he will talk with Hussain for guidance.[5]

Abdulkader did not meet with the source again until May 11, 2015.  However, the evidence does show the communications from Abdulkader to Hussain on May 10th, the day before he sees the source again.[6]  On May 10th, Abdulkader sent the following written communications to Hussain:

---

[5] The next day, May 8, 2015, the United States military publicly announced that it was increasing security at its military bases.  *www.cnn.com/2015/05/08/politics/isis-activity-prompts-threat-level-increase-at-bases.*

[6] Hussain's statements during this time period were not available, so we only have Abdulkader's side of the communications at that time.  Starting on May 16th, we have both sides of the written communications between Abdulkader and Hussain.

- That would be something Subhanallah!  But I wouldn't know where to start akh lol.  Plus there's two of us.

- Yeah but like luring them.  That'd be tricky.

- Yes, that should be no problem akh.

  [Other indications of OK, yeah, etc.]

- I'll read it carefully in Shaa Allah.  Then talk to the other bro and see what he says tomorrow when I see him and get back to you then akhi in Sha Allah.

- Seems simple tbh.

These communications indicate Abdulkader is receiving information from Hussain that appears relevant to Hussain's suggestions for an attack.  When the source meets him again on May 11, 2015, Abdulkader was communicating in writing with Hussain during the meeting.  They acknowledged the announcement of increased security at the military bases and Abdulkader writes back to Hussain: "Speaking about it, police station op it is."  All sides agree that Hussain suggests the idea of murdering an employee of a military base at the employee's home.  Abdulkader responds back to Hussain: "What about the address akh?  … And akh make it a soldier who invaded Iraq.  Soldier from 2012 to the present….  Just give us the address and in Sha Allah we good."  From there, the planning continued in earnest, but it is clear that the source did not suggest any plan or targets.

***The Role of Hussain***.  Throughout the report, Sageman also ignores and minimizes the role that Hussain played in suggesting, directing, and encouraging the attack.  Sageman claims that Hussain was too far away to have any influence, so Abdulkader was not likely to do anything. (Sageman Report, page 41.)  Hussain was a recruiter – he was pushing for exactly this type of attack.  And based on the Garland, Texas attack, Hussain had been able to influence at least those two attackers.  Sageman's confounding conclusion is a product of his deep-seeded biases reflected in his

18

new book.  Sageman has claimed that all informants result in entrapment and that there have been no direct links between ISIL and a homeland attack.  And so, Sageman rewrote the facts to reach a tortured conclusion.

**I.  Sageman's Views on Future Dangerousness.**

The Sageman Report also opines that the Defendant "will not be dangerous in the future in terms of returning to any terrorist activity."   Sageman bases this conclusion on recidivism rates for a subset of convicted terrorists that Sageman is aware of.  As demonstrated above, Sageman is not aware of all cases.  Moreover, his knowledge of the facts in terrorism cases is often flawed with inaccuracies and bias.

Sageman acknowledges that many of these convicted terrorists are still in jail.  Yet he concludes, quite unscientifically, that the "base rate of returning to terrorism is zero."[7]  This opinion is so speculative and unfounded that it should not be provided any weight.

Sageman's opinion on the future dangerousness of other terrorist defendants has been rejected before.  In *United States v. Mohamed Mohamud*, (D. Oregon, No. 3:10-CR-00475), the defendant was convicted of trying to detonate a truck bomb at a Christmas tree lighting celebration in downtown Portland.  Sageman provided a report at sentencing in which he opined that, because the defendant has given up his extremist ideology, the defendant was at "very low risk of being dangerous in the

---

[7] Sageman's book contains similar sweeping statements about recidivism for terrorists.  He wrote, "Given the terrorism enhancement to sentences, most convicted of terrorist offenses are incarcerated for a very long time and will not cause any problem in the near future." Misunderstanding Terrorism, page 83.

future, both in the criminal and political sense." The district court apparently gave little credence to Sageman's opinion, as it sentenced defendant Mohamud to 30 years of imprisonment.[8]

**J.** **Conclusion.**

For all of the reasons discussed above, the government submits that the Court should give no weight at sentencing to the report of Marc Sageman.

Respectfully submitted,
BENJAMIN C. GLASSMAN
United States Attorney

s/Timothy S. Mangan
TIMOTHY S. MANGAN
Assistant United States Attorney
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202

Michael Dittoe, Esq.
U.S. Dept. of Justice
National Security Division
950 Penn. Ave. N.W., Room 2740
Washington, DC 20530

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Sentencing Memorandum was served this 10th day of November, 2016 by ECF on all counsel of record.

s/Timothy S. Mangan
TIMOTHY S. MANGAN (069287)
Assistant United States Attorney

---

[8] Sageman includes this example in his book, claiming that the defendant Mohamud's inclusion on a "no fly" list accelerated his turn to violence, where there was previously a very low likelihood of such a turn, and create a terrorist where there was none." Misunderstanding Terrorism, page 85. Again, this is Sageman describing a person who pressed a button on a detonator in an attempt to murder families at a Christmas tree lighting ceremony.