```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF OHIO
 2                    WESTERN DIVISION

 3
                           - - -
 4
     UNITED STATES OF AMERICA,   .  CASE NO. 1:16-CR-019
 5                               .
              Plaintiff,         .
 6                               .  Sentencing
           - v -                 .
 7                               .
     MUNIR ABDULKADER,           .  Wednesday, November 23, 2016
 8                               .  11:10 a.m.
              Defendant.         .  Cincinnati, Ohio
 9   . . . . . . . . . . . . .   .

10

11                       PROCEEDINGS
        BEFORE THE HONORABLE MICHAEL R. BARRETT, DISTRICT JUDGE

12

     For the Plaintiff:     TIMOTHY S. MANGAN, ESQ. (AUSA)
13                          United States Attorney's Office
                            221 East Fourth Street, Suite 400
14                          Cincinnati, Ohio  45202

15   For the Defendant:     RICHARD MONAHAN, ESQ.
                            Federal Public Defender's Office
16                          250 East Fifth Street, Suite 350
                            Cincinnati, Ohio  45202
17

18   Also Present:          Michael Dittoe, Esq., Justice
                            Department, National Security Division,
19                          Counterterrorism Section

20                          Laura Shannon, U.S. Probation Officer

21
     Courtroom Deputy:      Barbara A. Crum
22

23   Court Reporter:        Maryann T. Maffia, RDR
                            239 Potter Stewart U.S. Courthouse
24                          100 East Fifth Street
                            Cincinnati, Ohio  45202
25                          513-564-7677
```

1      **P R O C E E D I N G S**

2    **COURTROOM DEPUTY:** On the docket is District Court

3 Case Number 1:16-CR-19: *United States of American versus*

4 *Munir Abdulkader.*

5  And we're here for sentencing.

6  At this time, all non-court personnel must turn their cell

7 phones or electronic devices to the Off position.

8    **THE COURT:** All right. Will counsel enter their

9 appearances for the record, please.

10    **MR. MANGAN:** Your Honor, Tim Mangan for the United

11 States. With me at counsel table is Michael Dittoe.

12    **MR. DITTOE:** Good morning, Your Honor.

13    **THE COURT:** Good morning.

14    **MR. MONAHAN:** Your Honor, Richard Monahan on behalf

15 of the defendant, Munir Abdulkader.

16    **THE COURT:** Richard, do you have any objection if I

17 refer to him by his first name as we go through the

18 proceedings?

19    **MR. MONAHAN:** That's fine, Your Honor. It's a long

20 last name.

21    **THE COURT:** Okay. No, it's just I usually -- I'm

22 informal. I like doing the first names. Okay.

23  So on March 24th of 2016, Munir appeared before me in the

24 District Court, pled guilty to an attempt to kill a government

25 employee or official, which was the first count of the

Information; Possession of a Firearm in Furtherance of a Crime

of Violence, which was the second count; and Attempted

Material Support to a Foreign Terrorist Organization, which

was the third count of the Information.

There was a Plea Agreement at that time.

As per our usual course, the case was referred to the

Probation Department for a presentence investigation and

report, which was initially prepared on April 18th, 2016, and

later revised on June 8th of 2016.

In addition to that, I received a letter which I have just

given to Richard.

And Tim, you had a copy of the letter; correct?

MR. MANGAN:  Yes, Your Honor.

THE COURT:  Okay.  Also, there were numerous letters

in support from family members and friends, and there was also

a letter, looks like in his own hand, by Munir to me directly.

In addition to that, I also received the government's

Sentencing Memorandum, Richard's Sentencing Memorandum,

Richard's report, and the responses which both sides filed

thereto.

I believe that is everything I should have in front of me;

right, guys?

MR. MANGAN:  That's right, Your Honor.  We did file a

Memo responding to their expert report too.

THE COURT:  Right, yeah.  I think I said replies.

1      MR. MONAHAN:  I think that was everything, yes,
2  Judge.
3      THE COURT:  Okay.  So, Tim, have you received a copy
4  of everything I've just discussed?
5      MR. MANGAN:  Yes, Your Honor.
6      THE COURT:  Richard, have you received a copy of all
7  the items I've just discussed and gone over those with Munir?
8      MR. MONAHAN:  Yes, Your Honor.
9      THE COURT:  Okay.  At the plea hearing, I explained
10  to Munir that the way it would work would be the Probation
11  Department would, in fact, conduct a presentence investigation
12  and prepare a report.
13      Consistent with that, let's just go through the offense
14  level computation.  I'll begin the discussion on that by
15  noting that Count Two is a statutory determination, so
16  grouping is not appropriate in this case.
17      Count One, Attempt to Kill Government Employees.  Base
18  Offense Level for a violation of 18 U.S.C. 1114 is found at
19  Guideline 2A2.1.  And, in that section, the discussion is if
20  the object of the offense would have constituted first degree
21  murder, the Base Offense Level is 33, pursuant to Guideline
22  2A2.1(a)(1), Mare.
23      Mr. Munir communicated with members of ISIL about planning
24  to attack a military base and/or kill identified military
25  personnel on account of his position or of that person's

position with the United States Government.  Then Munir, with

the guidance of ISIL, identified a government employee for the

potential target of that particular crime.  The plan was to

abduct him from his residence and behead him while filming the

execution.  Based upon the aforementioned, had the defendant

been successful, that would have been a crime of First Degree

Murder, so we do hit 33 on that.

     All right.  United States Sentencing Guideline 3A1.2(a)(1)

and (2) apply.  Therefore, six levels are added.

     In this case, they are applicable because the victim was a

government employee and the offense of conviction was

motivated by this status.

     In addition, the applicable guideline for Count One from

Chapter Two, Part A, Offenses Against the Person, applies, so

there is a six-level enhancement.

     The offense is a felony that involved or was intended to

promote a federal crime of terrorism.  Therefore, 12 levels

are added at that point to increase the level -- to increase

it to Level 32.

     And, as noted above, the conduct in Count One was intended

to promote a federal crime of terrorism and was fueled at the

behest of a foreign known terrorist organization, so the 12

levels are added.

     So as to Count One, it's 51.

     Then the Base Offense Level for a violation of 18 U.S.C.

2339B is found at Guideline 2M5.3.  That provides for a Base
Offense Level of 26 for Attempted Material Support to a
Foreign Terrorist Organization.

Under Guideline 2M5.3(b)(1), various levels can be added
if the offense involved either, (A), the use of a dangerous
weapons or explosives.  In this case, a dangerous weapon would
include an AK-47 weapon that was purchased, and also Molotov
cocktails which were believed to be used to commit the -- to
assist in the commission of the attack on the police station,
which we'll talk about a little later.

So he got a two-level enhancement for that.

Then again, because the crime involved the promotion of
terrorism, 12 levels are added.  The attack planned in this
case was to attack a local police station, so the 12 levels
are added.

So the Adjusted Offense Level on that count is a 40.

Then when you go through the grouping provisions of the
Sentencing Guidelines and then deduct the points for
acceptance of responsibility and timely notifying the
government of intent to enter a plea, you have to do a
three-point reduction for that.

You end up with a Total Offense Level, and it's a 43.

And because of the type of offense involved in this case,
contemplated in this case, the Criminal History is a VI.

The guidelines provision then for Counts One and -- let's

see, for Counts One and Three are 420 months.  For Count Two, the firearms charge, is five years which must be served consecutive to all other counts.

Both the United States and the defendant agree that variances are in order in this case, and the United States is requesting a variance for, without using the months, approximately 25 years, and the defense is seeking a variance of down to five years.

May I see counsel sidebar with their clients for just a moment, and the court reporter.

* * *

(Proceedings filed under seal.)

* * *

THE COURT:  Okay.  Richard, are there any objections to the calculations placed on the record as of this time?

MR. MONAHAN:  No, Your Honor.

THE COURT:  Tim?

MR. MANGAN:  No, Your Honor.

THE COURT:  Richard, are there any facts in the PSI that you and your client dispute, or are there any facts that you think need to be included in the PSI?

MR. MONAHAN:  No, Your Honor.

THE COURT:  Same question to the United States, Tim.

MR. MANGAN:  No, Your Honor.

THE COURT:  That being the case, I'm going to adopt

1    the Findings of Fact as contained in the Presentence Report as

2    my own, which include that Munir entered a valid plea to Count

3    One of the Information, and is, therefore, guilty in Case

4    Number 1:16-CR-19 of attempting to kill government employees

5    and officials, which is a Class C felony in violation of

6    18 U.S.C. 1114.

7        At the time of the plea, I told him what he was subjected

8    to in terms of maximum possible terms of imprisonment and a

9    potential for lifetime supervised release.

10        He also entered a valid plea to Count Two of the

11   Information and is, therefore, guilty of Count Two in the same

12   case number.  This charge is of Possession of a Firearm in

13   Furtherance of a Crime of Violence, which is a Class A felony.

14        I told him at that time, at the time of the plea, that a

15   violation of 18 U.S.C. 924 had a minimum sentence of five

16   years and could be up to life imprisonment, a $250,000 fine,

17   and also five years of supervised release.

18        Count Three of the Information, to which I have adjudged

19   him guilty, is Attempt to Provide Material Support to a

20   Foreign Terrorist Organization, a Class C felony in violation

21   of 18 U.S.C. 2339B.  We talked about the statutory provisions

22   at that time, which included the potential sentence and also

23   the lifetime of supervised release.

24        I have already, on the record, reviewed with counsel the

25   Offense Level and also the Criminal History, so is there

anything else that needs to be placed on the record in terms
of the objections, the calculations, or the Findings of Fact
that I have just gone through?

     MR. MANGAN:  No, Your Honor.

     MR. MONAHAN:  No, Your Honor.

     THE COURT:  Okay.

   Richard, it's time for us to proceed to the actual
sentencing portion of this case.  Do you or your client have
anything you wish to say in anticipation of a potential
sentence, understanding the guideline calculation and the
recommendations, or anything in mitigation?

     MR. MONAHAN:  Yes, Your Honor.

     THE COURT:  All right.

     MR. MONAHAN:  I have four broad topics I'd like to
discuss with the Court today in considering an appropriate
sentence in this case:

   First would be my client's good character and past
history;

   Second would be his conduct upon his arrest and he how he
handled himself at that point.

   Third, I want to talk about the seriousness of this
offense itself and how that affects the considerations of the
need to protect the public and the possible future crime of my
client; and

   Fourth, I'd like to do kind of an overview of what other

1    Courts are doing with these types of cases.

2        And I think the first --

3            THE COURT:  I did not -- I didn't mention that, but I

4    did receive the chart you submitted as well.

5            MR. MONAHAN:  Yes.

6            THE COURT:  Yeah.  I had not mentioned that before in

7    terms of the material submitted, but I did get your chart.

8    Okay.

9            MR. MONAHAN:  First, my client's good character.

10       And I think a lot of this goes without saying, because

11   it's very obvious, but I will -- I think it's important to,

12   you know, very clearly point out at this point.  We're talking

13   about, obviously, a 20-year-old individual at the time that he

14   was involved with the informant in this matter and at the time

15   that he made the plans that he did.  He was 20 years old.

16       He was -- you know, leading up to when he got involved in

17   this, really, a model student, a model son, a model friend, a

18   model neighbor.

19       As you know, he went to Lakota East Schools, which is a

20   good school system.  He did reasonably well in school.  He

21   graduated, went to college at Xavier University studying

22   Chemistry.  He had a minor in --

23       Business?

24           THE DEFENDANT:  That's right.

25           MR. MONAHAN:  His plan, as you saw from the report,

I'm sure, was he going to be a chemist for Procter & Gamble.

He was -- he is Muslim, as you know. He was raised Muslim. His family is Muslim. They go to the temple there in West Chester. I think, really, part of their culture is -- they are living in West Chester. There is a small Muslim community there, but, in large part, they keep to their family and very close friends. There's a lot of prayers that are involved in the Muslim community.

So I think what you can see in the Presentence Report is he was a kid that was popular in school, he was liked in school, but his social activities really didn't go beyond the school itself. He stuck mostly to his family outside of school and to his neighbors.

So he is a good person. He is a quiet person. He is, I would say, a shy person.

I think one of the important things to look at in this case are the letters that were submitted by his family.

THE COURT: Yeah. I was going to say, the letters in support -- in addition to what's in the PSI, the letters in support echo what you've just said. Yeah. Go ahead.

MR. MONAHAN: I think, you know, what I gleaned from looking at the comments in the Presentence Report and the letters from family and friends is he is a "very smart" --

And most of this is quoted right out of the letters.

1    -- "very smart, generous, respectful, nonviolent" --

2    I saw that in there more than once.

3    -- "and deeply devoted to his faith" and "a beautiful

4    person with a heart of gold."

5    You can see that some of the people have known this family

6    for more than ten years.  I know that one of the individuals

7    that, I thought, stood out to me said that when trying to

8    instill good moral values in his own children, he would refer

9    to Munir, said, "Be like Munir.  He is a good example of good

10   character."

11   Another person who had known the family 13 years commented

12   how "courteous, gentle and reserved" my client is.

13   There was another one who had known the family over ten

14   years, commenting he was "kind, respectful and thoughtful."

15   There was a letter in there from his manager at work.  He

16   had been working there for a year at that point when he was

17   arrested.  He said he was "a sweet kid who always brought his

18   smile to work.  Very reliable, generous and willing to help

19   others."  She "never saw any negative attribute" from him in

20   the year he worked there.

21   Finally, there was a neighbor and friend who had known him

22   for ten years, wrote the Court to describe "what a kind soul

23   Munir is," how he would do little things for their family like

24   helping carry in groceries, helping to move furniture.  They

25   explained he had a lot of patience and was always hard-working

1    and generous.

2        I really don't think there is any dispute in this case

3    from the government about what a nice kid he was before this.

4    He was just a good, peaceful, kind, generous person who really

5    -- there is not even a hint he had any problem with anybody

6    ever at any point in his life.

7        So I realize the offense is serious.  But, nonetheless, I

8    think these are things you can't say about a lot of the

9    defendants in these cases.

10        So I wanted to start with that as, sort of, our bedrock

11    here.  He's never been in trouble, he has no criminal record,

12    and he is, from everything we can tell -- and I don't believe

13    the government submitted otherwise -- was a kind, gentle, and

14    thoughtful person.

15        Now, obviously, when he is arrested in this case, these

16    are based on serious allegations.

17        And this is the second topic I wanted to cover, and this

18    is how he handled himself upon arrest, which is not what all

19    defendants do certainly.  You can see this reflected in the

20    report of our expert.  I don't believe the government has

21    disputed it in any way.  But he's arrested, and he immediately

22    confesses to what he has done entirely.  He renounces his

23    system of beliefs, and I know you've heard at sidebar his

24    efforts in that regard.

25        He agreed for a very long period of time for the case to

1 remain under seal and to waive indictment period, a very long

2 period of time. We didn't even ask for a bond hearing in this

3 case. He just sat in the jail for a very, very long stretch.

4     We worked out a Plea Agreement, obviously, pre-Indictment.

5 He did not require them to go to the grand jury. We agreed to

6 an Information. We agreed to three very serious charges.

7     We agreed to a sentencing guideline calculation with the

8 government which, obviously, you know what that is, and he

9 never batted an eye, really, at this. He was --

10     He did a 180, Judge, when he was arrested. He -- and

11 that's not necessarily that common with people that get down

12 the rabbit hole on these kinds of crimes that still want to

13 hang onto those beliefs and still try to reach out or get on

14 the Internet and continue to espouse his views or are,

15 frankly, outright belligerent in court about their view in the

16 world.

17     But that was not him. If he -- really, if you could sit

18 down with this individual, it's difficult to believe, you

19 know, seeing the person that's here. Obviously, you're

20 reading some of the things that he said and agreed to. It

21 seems to be extremely out of character for who he is, both

22 before and after his arrest.

23       THE COURT: Well, you know, most of the times we have

24 these cases, we all know why the person is here. You can see

25 it starts juvenile records, works its way through adult crimes

1   and all that.

2       And this does appear to be out of character, but we've

3   also had plenty of defendants where it is out of character,

4   and the family wonders:  "How did it happen?  How did they get

5   involved?"  But they did get involved, and that's what we're

6   dealing with here, I think.

7           MR. MONAHAN:  No doubt.  And that actually

8   transitions me to my third topic, which is the seriousness of

9   this crime and how he got there.

10      The government has obviously taken a lot of issue with our

11  expert.  The point of the expert was to try to give you some

12  perspective on how he got there.  You know, the expert spent

13  four and a half hours with him, a couple of hours with his

14  family, obviously read all of the government's discovery

15  materials, and did a painstaking analysis of those

16  conversations, which is what we received in the discovery,

17  were these conversations with the informant.

18          THE COURT:  And I thought that was helpful.

19          MR. MONAHAN:  Thank you.

20          THE COURT:  Yeah.

21          MR. MONAHAN:  It's a very serious crime, and I want

22  to lead by saying that he is not in any way telling you he is

23  not responsible for this crime.  Okay?  He is responsible for

24  what he did.  He admitted that on day one upon his arrest.  He

25  has repeatedly stuck to that position throughout this case,

and that is where he is today.  He did wrong.  He agreed to commit a very, very serious crime.

He is extraordinarily embarrassed for himself that he ever got to that point, and for his faith, and for this family, and to this poor individual who was the target of this crime.  I don't think --

It's difficult to understand how this person got to this point.  And I know you have read 47 pages from our expert who, I think, also struggled with how did he get to this point.

So some of what I am trying to do today and with the expert and with our Memo is, perhaps, shed some light on how we view that and the kind of person we want you to see him as here, the kind of person he is and that we want you to see.

I think you could broadly categorize people, you know, into leader types and follower types, you know, leader types and/or lone wolf types who are going to get ideas in their head and they're going to do them regardless of what anyone else tells them, regardless of the facts.  It's some kind of anti-social view of the world.

And I'm going to submit:  That's not him.  Okay?  And that's a lot of the point of what we're trying to do with this expert report is.  He's not the leader type.  He's not the kid that goes out on the playground and just beats up other kids without any egging on or anyone else saying, "Hey, this is a good idea."  You know, there are those kids.  There are those

people that do that.  There are those people that go offend.

I think when we look at some of the cases the government cited where those high sentences, I think we can put a lot of those defendants into that group:  The white supremacist who tried to bomb the Martin Luther King Day parade.

You know, there are these lone wolf/leader type of individuals that are going to do what they're going to do. And, I would submit to you, those are the people we really need to be careful of and we really need to punish severely.

I will submit to you that that is not who he is.  And that's what we're hoping you will see, in large part, with that expert report

THE COURT:  Well, I -- not your opinion about what I should do with Munir, but, I mean, I kind of agree, he's not the lone wolf person like that.

But from his own letter to me and from what I've read, he is a follower.  And, you know, the -- in life every day --

And, you know, the letter describes somebody, I think, that's kind of lonely and, you know, has a hard time socializing and things like that, as you said, outside of the family and a close circle of friends.  But oftentimes people like that have, as a result of their loneliness and their inability to socialize --

I mean, oftentimes they're recruited for organizations to do good.  I mean, those are the kind of the people that go out

1  and maybe they see a wrong and they do good works and things

2  like that, but they're also the kind of people that are

3  recruited by gangs, by mobsters, and, in this case, by a

4  terrorist organization.  And they're the kind of people that

5  go along sometimes.  And we know from the record what he was

6  going along with, and you got to --

7      So the gullibility and the -- I don't know if you want to

8  use the word "naiveté," because he did try to get a passport

9  and then, you know, sort of worked his way up the ladder,

10  unfortunately for him.

11      But that willingness to follow, isn't that what creates

12  the people that the terrorist organizations use for bad acts?

13  And I'm struggling with that, because --

14          MR. MONAHAN:  I can't say I disagree with anything

15  you said.

16          THE COURT:  Yeah.

17          MR. MONAHAN:  I think you're -- I think that's right.

18  I think that's what he did.  I think he followed.  I think he

19  made really bad choices, and I think he agreed to commit a

20  terrorist act.  I mean, that's -- you know, without a doubt,

21  that's all correct.  And I think, obviously, he's got to be

22  punished for that decision and he's got to be -- society has

23  got to be protected.

24      So it just takes us to the question of how much is enough

25  here.  I know this is delicate ground, and I know Mr. Mangan

will take issue with this argument, but what we want to

suggest to you is that he's a follower, and it was a

combination of, you know, what you read on the Internet that

ISIS puts out there, actually, having the misfortune of

getting in contact with what, I believe, was the government's

number-three target with ISIS, this Hussain guy.  So he hit,

you know -- I mean, that -- I don't know that he did anything

special.  It happened.

He got in touch with this Hussain guy who, obviously, is

persuasive.  He convinced, as Mr. Mangan pointed out, these

people in Texas to do -- was it the daycare shooting thing,

whatever that horrible crime was down there.  So this is a --

you know, he unfortunately got in touch with a high-level

person.

THE COURT:  But as he's going --

And this is the hard part for you and Munir.

As he's going through the process -- okay?  If you believe

the discussion about the first time at the firing range, he's

nervous when he fires the weapon.  Okay?  But he didn't stay

in the car, and he didn't say, "I've never fired a weapon

before.  I don't want to fire it."  He went and did it.  And

then --

I mean, in this case, had the person he was in contact

with had been real, I mean, two bad acts may very well have

occurred, and Munir would have been right there on Front

1  Street involved in those.

2      And that's the problem that I face.  I looked at his

3  background and his character, and based upon what the game

4  plan was, if this thing would have been -- if it would have

5  come to fruition.

6          MR. MONAHAN:  And I think somewhere in there is the

7  million-dollar question.  I mean, look:  How far was this

8  going to go?

9      And I know they disagree with this discussion about how

10 important the informant was in getting this far, but how

11 important was the informant in getting this far?  You know,

12 it's one thing --

13     He has been looking on Twitter and talking to this Hussain

14 guy.  This is all, you know, someone communicating with me in

15 texts and stuff I'm reading online.  And before he met the

16 informant, the plan was travel.  Okay?  Not -- unfortunately,

17 a lot of people are doing that.

18         THE COURT:  Yeah, get the passport.  Yeah, I know.

19         MR. MONAHAN:  Yeah.  And so up until January -- and

20 I'm going to talk about some months.  This is all 2015.  Okay?

21 So January of 2015, his plan was travel.  He ordered the

22 passport, and I think that's what targeted them to go, "Okay,

23 this is a real problem.  He's now saying he wants to travel,

24 and he's getting a passport."  So they send in the informant.

25 Okay?

And I am not today going to fault the government for that investigative technique. We realize it is an important technique. We realize they use it, not just in terrorism, but in all kinds of cases.

THE COURT: Well, I was going to say, I mean, this is -- because of the acts in this case, it has attention. But on -- I don't want to say a routine basis, but it's not unusual.

I just had a case not long ago where agents were talking with five thugs about robbing a drug dealer. Part of the argument made was: Well, these guys, you know, the agents did this and that.

But the fact of the matter is, these guys were prepared to go kill who they believed were cartel drug dealers, and then rob the drugs and the money.

MR. MONAHAN: No doubt.

THE COURT: So you have to consider -- in spite of the intervention of somebody else, you have to consider the frame of mind; right? I mean, don't I?

MR. MONAHAN: No doubt. He had the frame of mind. I'm not --

THE COURT: Yeah.

MR. MONAHAN: Again, he had the frame of mind. We'll openly admit that his frame of mind was there. His plan was to travel to try to join ISIL. That was January. Okay?

Now, it was not a great plan, it was not a solid plan, and

1   it wasn't concrete at that point.  He did order the passport.

2       But if you look at the expert's rendition --

3       And I don't think the government has disputed them.

4       On these early conversations with the informant, I think

5   the first recorded conversation with the informant was in

6   March.

7       To be clear on that timeframe, the informant meets him in

8   January.  Okay?

9           THE COURT:  Mm-hmm.

10          MR. MONAHAN:  And this informant, by the way, is

11  about ten years older than my client.  So we have a

12  20-year-old guy meeting -- I don't know his exact age, but I

13  believe it's about 30.  Okay?  So that's a -- number one,

14  that's a big difference.  Okay?

15      He is introduced to my client in January as a student

16  auditing classes at Xavier.

17          THE COURT:  Right.

18          MR. MONAHAN:  He meets my client, and they spend a

19  month and a half talking.  It's not recorded.  Okay?

20      So the first recordings we did are in March.  And it's

21  very clear when you look at those recordings, the plan is

22  travel.  They talk about, "We may try to do this in early

23  May."  And that's really the plan at that point.

24      That plan morphs into the horrible plan, you know, that

25  this ends up at.

And so what we're asking you to look at and consider is, we have a follower here who is introduced to a government informant. And that is the point at which the plan morphs.

Now, my client is not denying he agreed to all this. He is not denying he threw in input into all this. Okay? But we submit to you that's a mitigating consideration because you've got to look at, when he gets out, "Is he going to do this again?" All right?

It was these circumstances that led him to this plan. It was having another warm body there willing to do these things with him.

Now, I'm not here to say the informant came up with the whole plan and did the whole thing. That's not the facts. Okay? But what he was was a guy willing to do it.

You know, how easy is it in the locker room to pull the underwear over the other kid's head when you're doing it on your own idea versus when you got a buddy there going, "Yeah, yeah. Do it. Do it. Pull the underwear over his head"? I mean, it's another body willing to do this with him. Okay?

So that's what we need to think about.

THE COURT: I understand that concept.

MR. MONAHAN: All right. Now, I want to -- what the expert has done -- and he's kind of gone a step further and really spent the time to get into the nuances of that relationship. I mean, I know that the government disagrees

1  with what the expert says were the nuances of that

2  relationship.

3      I want to give you a snippet.  I know you've had the

4  chance to read it all, but I've picked up something -- this is

5  actually something the government brought up in its Sentencing

6  Memo, and I wanted to just kind of point out a little bit just

7  to give you a flavor of how these conversations went between

8  these two.

9      I'm going to use the ELMO, if that's okay.

10             THE COURT:  I'm not plugged in.

11             MR. MONAHAN:  And I can give you copies of any of

12  this.

13             THE COURT:  Is this from the report itself or --

14             MR. MONAHAN:  Well, I'm going to show you first a

15  little piece of the government's Sentencing Memo just to see

16  what they talked about, and then I'm going to show you an

17  actual transcript of one of the recordings.  I'm going to show

18  you -- which you will not have seen before.  You will have

19  seen it discussed in that expert's report, but I have the

20  actual transcript of the conversation.  It's very short.

21  There's nothing tricky about that.

22             THE COURT:  There's no problem publicly displaying

23  this stuff, Tim?

24             MR. MONAHAN:  I can, I think -- I can do it under

25  seal if we need to.

```
 1              THE COURT:  Well, do you --
 2              MR. MANGAN:  No, I don't think so, I mean, based on
 3    what he said it is.
 4              THE COURT:  Richard, will you show Tim what you're
 5    going to --
 6              MR. MONAHAN:  He gave it to me.  Yeah.  I've given
 7    him a copy today.  This is all stuff the government gave me.
 8              THE COURT:  Well, I know, but there may be stuff you
 9    got in discovery, though, that still would not be in the
10    public domain.
11              MR. MANGAN:  No, I received it this morning.
12              THE COURT:  So are you okay with that?
13              MR. MANGAN:  Yes.
14              THE COURT:  Okay.  Put it up then, Barb.
15              COURTROOM DEPUTY:  Do you want the big screen to come
16    down or just the little screen?
17              THE COURT:  The little screens are fine.
18              MR. MONAHAN:  And, Judge, I can give you copies of it
19    just to have up there.  I'm also going to put it up here.
20    Whatever is easiest for you.
21        Let's start with the government's Memo.  This is something
22    they've focused on, and I think they appropriately focus on it
23    because it's an important part of the case.  Okay?
24        This is page 12 of the government's -- I think this was
25    their response to the expert's report.  It was Document Number
```

52.

They focus on what was the initiation of this homeland attack plan.  Okay?  Our expert went through the conversations and concluded that on May 7th, really, is the first mention of the actual plan to go forward with the attack.  And I think this is an important time because we've gone from "I'm going to travel" to "Now we are going to do something here on American soil."

So how do we get to this point?

Again, I will say, my client is a part of this plan.  At no point am I going to say he wasn't, "Yeah, yeah, we're going to do this."  He was agreeable to all of this.

But this is the subtlety of how this plan developed.  Because you've got a guy that's ten years older than my client here with a whole wealth of either real knowledge or pretend knowledge that he's constantly sharing with my client.  And the recorded parts, that's just the parts we can hear.

So the government says -- my expert says May 7th, that's when the plan develops.  The government says wait a minute, wait a minute, April 21st is actually the first time my client mentions the thought of doing something here.  But I don't disagree with that.  I don't disagree that April 21st, my client did mention that.  And, I will say, that's in my expert's report.  There is no hiding the ball there.  If you look at April 21st on the expert report, he references this

1    exact conversation.

2            THE COURT:  Right.

3            MR. MONAHAN:  So the expert just concludes that's not

4    really the onset of this plan.  The real onset of this plan

5    happens on May 7th.

6        But let me -- since the government brought this up, I

7    thought this was a great point to highlight.  Okay?

8        There are three conversations that occurred that I want to

9    talk about.  There is the May 7th one, which the expert

10   mentions; there is the April 21st one, which Mr. Mangan

11   mentioned; and there is one not long before that, which was

12   April 9.  Okay?

13       I want to talk about first what the informant did on April

14   9th before we get to the April 21st conversation and then on

15   to the May 9th conversation.  And I do this just -- I think

16   this is very characteristic of how those conversations went,

17   and so I want to give you that example as well.

18       So April 9th -- and I don't intend for you to read all

19   this.  I'm going to just -- but I can -- you can if you'd

20   like.

21       What they're doing --

22       This is -- my client is MA, and the informant is CHS.

23   They are discussing here, Judge, the Internet and how to do

24   searches and how to be on the Internet and concerns about

25   government monitoring of Internet usage.  Okay?  And I'm not

1    --

2        So on this first page, I wasn't so much focused on the

3    substance, really; it's just to give you a flavor here.  So

4    just take a look at -- you know, MA is my client.  CHS is the

5    informant.

6            THE COURT:  I've got it.

7            MR. MONAHAN:  That's very typical of how the

8    conversation went.  The informant has a wealth of knowledge

9    about any topic.  Okay?  Here they're talking about the

10   Internet being secret, so he blathers on and on about all his

11   knowledge about Google and how to keep things secret and using

12   Apple, Microsoft, Google, how they are accommodating

13   investigators and who -- it's a bunch of -- you know, a

14   30-year-old talking to a 20-year-old who knows the ways of the

15   world.

16       And however much you want to read the detail about it, I

17   want to go to the next page of that conversation.

18       Oh, did you want me to keep that up?

19           THE COURT:  No.  I read it.  I read it.

20           MR. MONAHAN:  Okay.  So the second page -- and this

21   is where it becomes important.  I've highlighted how this

22   conversation proceeded from there.

23       So they're still talking about the Internet.  In the

24   highlighted part, the informant says, "So in this country,

25   like, just talking about regular white folks like Americans,

they're -- they just don't like it.  They're not doing
anything wrong, but they simply don't like the fact that the
government has that kind of access to their privacy.  They
just value their privacy, just like they value, you know what
I mean, like, even, like, with gun rights.  Like, you can own
a gun, you know, I own guns, and I -- I like the fact that I
can own guns.  I think that that's a great aspect of this
country.  I think it keeps tyranny in check."

Okay?  This is the first reference I can find of any
conversation between these two about a gun.  Okay?

The informant subsequently slides this in in the middle of
a conversation about Internet use.  Then he goes on at that
end of that dissertation to say, "I can go to the gun store
five miles from here and buy a gun right now.  Right now, I
can do that.  A rifle."

All right?  This is subtle.  This is nuanced.  But these
two are talking for hours and hours and hours and hours and
hours.  Okay?  And this is the kind of subtlety the expert is
picking up on.  All right?  The government doesn't mention
this conversation.  But it's, from what I can see, it's the
first reference to a gun between these two.  All right?

And then, of course, you can see Munir doesn't really
appear to know anything about that at all.  He asks a couple
of, you know, questions about it.  "Do you have to have a
license?  The informant says, "A rifle right now.  No, you

1    don't."  Okay?

2        All right.  So that's kind of the preface on April 9th.

3    And I guess that I had the third page of that conversation,

4    which I've also highlighted, where you can see here the expert

5    is emphasizing how quickly you can get one.  "It takes the

6    same day.  It takes a couple of hours, something like that,

7    two, three hours if you pass it," and then he talks about

8    whether they're on the FBI watch list or not.

9        So, again, it's just emphasizing, "Hey, you can get a gun.

10   You can get a rifle.  It's easy."  First time this is ever

11   discussed, and that was brought on by the informant.

12       All right.  Now, that's April 9th.  We come over to April

13   21st, which is the day the government mentions in the

14   Sentencing Memorandum.  I have -- this is page 13 from my

15   expert's report which summarizes that conversation with

16   quotations.  So this is the part that happened before what

17   Mr. Mangan gave you in the Sentencing Memo.  Okay?

18       I've highlighted what I thought was a relevant part.

19   They're talking about cars and repairing them.  That was where

20   this conversation started.  Then the informant asked

21   Mr. Abdulkader whether he had a pocket knife because it came

22   in handy.  "It also had a long blade if he ever needed to

23   defend himself.  It was a tool and could not be considered a

24   weapon."

25       Okay?  And that was a little bit out of left field.

So Mr. Abdulkader agreed that it would be good to keep one in the car and added, "I don't know the steps of getting a gun at" -- unintelligible, but presumably at some location.

Now, this is, what, a week and a half after the April 9th conversation where the informant had plugged him about a gun and getting a gun and how easy it is. So that was a natural, you know, follow-up question.

So the informant then says, "You have to be 21 to buy a pistol to keep in the car, but you only have to be 18 to buy a rifle." Again, he's bringing up "rifle."

Mr. Abdulkader was surprised. "A rifle, like a sniper rifle?"

The informant answers, "A sniper rifle or a shotgun or a regular rifle like an AR-15 or an AK-47 or something like that."

So, again, this is very subtle, but this is -- here is now our first mention about assault rifles -- okay? -- which is ultimately what they're going to buy. But when you read that expert report, this is what he's picking up on. It's things like this. It's kind of hard to put a thumb on it. That's why I'm just choosing to give you a little snippet.

THE COURT: Uh-huh.

MR. MONAHAN: So then we have Mr. Abdulkader asks, "Where do you get it from"?

The CHS replies, "Any gun stores."

1    Mr. Abdulkader was curious about guns, and the CHS said,

2 "I can answer any questions you have for me, you know,

3 regarding that, you know, I have a lot of guns," which I don't

4 know if that's true or not, but that's what he, kind of,

5 repeats to my client a number of times.

6    Now, this is where we get to the part the government

7 mentions in the Sentencing Memo where my client brings up if

8 they were going to do something nearer for the first time.

9 But it comes up in this context.

10    The next page, which would be 14 of the expert's report

11 --

12    I've highlighted this section.

13    -- later in the conversation, the informant asks, "What

14 are you going to do all summer?"

15    Mr. Abdulkader's answer was inaudible, and the informant

16 chuckles and says, "Buy a gun?"

17    That was not what Mr. Abdulkader had said.

18    And the informant continued, "I was like, oh, okay.  No, I

19 was like, whatever, you know."  He kind of brushes it off.

20     And then Mr. Abdulkader says the statement the government

21 has focused on:  "I mean, to be honest, the only time I would

22 buy a gun is if I find something here."  Okay?  So that's

23 where the government picked up on the conversation.

24    But do you see all the lead-in?  This is not my client

25 coming in and going, "Here's everything I want to do."  Okay?

Subtle ideas are planted in his head.  He does pick up on
them, and he does agree to them.  Okay?

Now, they suggest that's irrelevant.  I think it's totally
and entirely relevant.  The motivation for someone to do
something is, I think, a very good indicator for the Court in
determining would he likely ever do this again.  I can't think
of much more relevant information than that.  You know, what
motivated him?  What caused him to get to the point that he
did?

We could go on and on like this for hours.  I think that's
the point of the expert's report, is to give you that
blow-by-blow, day-by-day description of how these subtleties
get floated into my client, and he picks up on an idea and
runs with them.  He runs with them.  Okay?

And, also, all the while he's got this Hussain guy in his
ear.  Okay?  This guy who is actually with ISIS gives him
ideas too.  You know?  The end plot, the decision to target
this military person, came directly from Hussain.  I think
it's been in the media as the same as hacked computers and
gotten information about, you know, American operations and
who people are in American operations, and he gives him --
Hussain gives him this name.

Okay.  So we would submit the expert's report is highly
relevant and highly appropriate and highly useful in picking
up those nuances.

1    You know, I know that the expert makes some bold

2  conclusions at the end of that report that the government

3  hasn't furthered the fight against terrorism here in this kind

4  of respect.  I know that the government has targeted on those

5  particular statements.  I think the point, from our

6  perspective in this case, is to take this for what it's worth,

7  and that is:  there were a lot of subtle nuances between this

8  informant and my client, and perhaps having that other body

9  next to him willing to do, even possibly giving some

10 meaningful input on doing some things here in this country, is

11 what emboldened my client to reach that point that he was

12 going to agree with that.

13    And I think that's important because, as you look at cases

14 from other districts -- and I know the government is probably

15 going to say this in a moment.  A lot of these lower-sentence

16 cases were pointing to travel cases, cases where the defendant

17 claimed to travel to join ISIS.  That was this case.  You

18 know, they could have just arrested him when he applied to get

19 a passport with a clear intent to travel.  They could have

20 just arrested him.  That's what they do in a lot of cases, you

21 know?  They didn't.  They sent in an informant, and now the

22 plan is a much bigger and more dangerous plan here on United

23 States soil.

24    Now, I want to say this.  I'm not convinced -- I don't

25 think the Court should be convinced that a person who wants to

travel to Syria to kill people over there is a lot different than the person who makes a plan to kill someone here.  Either way, this is murdering Americans or murdering people, innocents.  I mean, it's all about murdering other people, all of these cases are, every single one of them.  Whether you're going to travel to Syria and do it and you get training here first before you do it, whatever your plan is, it's all about murder in the end.

So, you know, we have graphic detail here, and we have an actual face on the victim, but all of these travel cases are about that.  That's the reason the government goes after these people.

So I don't necessarily think that just because someone plans to travel and kill people versus someone, for instance, trying to kill someone here, I don't think that requires decades longer in the sentence.

And I guess that takes us to the final consideration: What are Courts doing with these cases?

I don't think we've had -- I don't think either side came up with a real good example in this district.  Obviously, we just haven't had a lot of terrorism here.  So I started with what's our closest analogy and then kind of expanded from there, which is what led ultimately to the chart which combined both the government's cases and our cases.

So I want to start by talking about what, we submit, is

the closest analogy to our case, and that's this Cleveland case. There were five defendants in that case. These five defendants are referenced in my Sentencing Memorandum. I've also given you the cite to the Sixth Circuit decision, which was *United States versus Stafford.* They are also included on the graph that you have, that very colorful graph there with all of the sentences.

All of these defendants got less than 15 years in prison.

I think it's important just to take a moment to compare the facts of that case to the facts of our case. And I'm going to anticipate how the government will distinguish them and try to say that's not an important distinction.

This was 2012-ish. Five individuals in Cleveland planned -- there were a number of plans, and they're all mentioned in the Sixth Circuit decision, but they were going to attack financial institutions, bridges, and police in the Cleveland area. That was their rough planning. That's right out of the Sixth Circuit. What they end up landing on is a conspiracy to blow up a bridge. Okay?

The Sixth Circuit described this, in its opinion, as a "terrorist cell," is what they called these individuals. Now, they were an offshoot of Occupy, the Occupy movement, you know, a bad offshoot, obviously. I'm sure the government will say, "Well, that's different than being connected with ISIS." I don't know. It's terrorism, and all of these systems are

bad, but this was a terrorist cell.  The plan was to blow up the bridge.

    And this is what is really important as you look at all these sentences.  These guys got what they believed was a bomb, they put it at the base of the bridge, they went to -- they had cell phone detonators, and they pulled the trigger. They lit the fuse, however you want to say it.  They did all of the acts necessary to blow up a weapon of mass destruction and kill who knows how many people.  I believe they actually went to the bar to celebrate thinking they had accomplished their goal.  It was fake explosives they had gotten from an informant unknowingly, and the bridge didn't blow up.

    Now, I would submit to you that those guys are more culpable than my client.  Okay?  They completed the plan. They did it.  They did the act.  It's only but for the FBI's intervention the act didn't result in a lot of people dying.

    So now we look at the sentences.  And one of these guys went to trial in that case.  Okay?  So we go back and look at the sentences these individuals got.  And I think this is a great comparison.  It's also this -- it's also Ohio, so it's the closest, you know, district to what we're doing here.

    So we have -- Stafford went to trial on the case, and he got ten years in prison.  The remaining defendants got: eleven and a half years; nine and three-quarter years; eight years and one month; and 6.75 years.

1    Okay. The government is asking for 25 for Mr. Abdulkader.

2    That is way out of line with -- I think, the nearest --

3    I would submit, this was a more serious case because these

4    individuals completed all the acts necessary to commit the

5    crime, to actually cause the damage to who knows how many

6    people.

7    Now, I understand the Sixth Circuit law is you can't just

8    look at local cases. When they say you must compare it with

9    other defendants' sentences, that is meant as more of a

10   national level. That is what published Sixth Circuit has

11   said. In fact, that is *United States versus Wallace*, 597 F.3d

12   794, Sixth Circuit 2010. "In considering the 3553(a)(6)

13   factor, the Court is required to consider national disparities

14   of defendants with similar criminal histories convicted of

15   similar criminal conduct."

16   So, with that in mind, we expanded the search to include a

17   national -- trying to find any kind of similar cases we could

18   at the national level. We submitted the chart. The

19   government then responded with another chart with higher

20   sentences. I took both those of charts and combined them into

21   this graph, and that's what I would like to talk about for a

22   few minutes, if I may. And I think this is important.

23   So here we have --

24   I think I've got it all on there, just about.

25            COURTROOM DEPUTY: Richard, you can use the wheel on

1    top.

2            MR. MONAHAN:  Does it open up?

3            COURTROOM DEPUTY:  The wheel, yeah.

4            THE COURT:  I've got it in front of me, Richard, so

5    --

6            MR. MONAHAN:  Oh, okay.  I'm also going to point.  I

7    wrote little numbers in here to help me keep track of which

8    case is which.  I'm going to talk a lot about these.

9        All right.  First of all, we have, I believe, 37 cases

10   here.  That includes the ones the government provided, that

11   includes the ones I provided in my chart, and then it also

12   includes --

13       The government mentioned that Minnesota case?  I believe

14   it was sentenced last week.  They burned through all those

15   defendants last week.  They mentioned a couple at the high end

16   of that range, but actually there were nine defendants that

17   were sentenced with a variety of sentences from time served

18   all the way up to 35 years.  Okay?  So that was the nine

19   defendants in Minnesota.  They're also included on this chart.

20       So if you take all 37 cases that were cited by both the

21   government and the defense, the median sentence was 15 years.

22   That's the center red line here.  That was the median sentence

23   for all defendants that either side could bring up for you to

24   consider.

25       There are 20 cases that were at or below the median, and

you can see those.  On the left-hand side, there are sentences of similar defendants.  These include, obviously, all of the Cleveland cases that I just mentioned, and the rest of these cases I believe are included in my Sentencing Memorandum with the exception of the Minnesota cases that we added when the government brought them up last week.

So I want to just talk about a couple of these cases for you to consider, and these were also cited in my Sentencing Memorandum.

*United States versus Conley,* which is -- this is number three.  That was this sentence here, number three, the third one in from the left.  This is a defendant from the District of Colorado.  I referenced this in the Memo, and I gave you the District Court citation to this case.  This person was connected directly with an operative of ISIS by the name of Mouelhi, M-O-U-E-L-H-I.  So, similar to my client, this person actually was connected with an ISIS operator or recruiter.  This person joined an army -- a U.S. Army Explorers training camp here in the United States to be trained in military operations and firearm use and then was about to travel to join this informant in ISIS, basically was being a terrorist.  That person was caught at that point by the FBI and got four years in prison.

So, obviously, there are a couple of similarities there between my client and this person.  That was a four-year

sentence out of the District of Colorado.

The next case, which is fourth from there, is *United States versus Khan*. This is the case out of the Northern District of Illinois. This is also mentioned in my Sentencing Memorandum, page 5. This defendant planned to travel to fight for ISIS and recruited two minors, who were siblings, recruited two minors to go overseas to probably die and do this fight. So here we have someone who recruited two other individuals and planned to travel over to fight for ISIS and got a five-year sentence from the Northern District of Illinois.

THE COURT: But didn't the government go along with the five-year sentence in that deal?

MR. MONAHAN: I don't know. They may know that.

MR. DITTOE: I apologize if I'm speaking out of turn. *Khan* was actually my case, Your Honor, and we had recommended five years. The Court actually sentenced the defendant to approximately 3.3 years. Now, there is a lot of distinctions in that case that we could address at the appropriate time.

THE COURT: Okay.

MR. MONAHAN: I just realized I wrote that on my Memo. That one was pending sentencing, and that was the government's agreement, was the five years. So he just updated -- I did have that in my Memo; I just overlooked it as I was standing here. They agreed to five. The Court

sentenced 3.3.

Okay. Now, I'm not going to go through each one of these because there's a lot here, but I think you got the point.

Look at all these cases that come in. You know, if we just took 15 as kind of a median number, all of these similar sentences come into that. Quite of few of those of that District of Minnesota case that the government cited -- the first one is Yusef, got 1.75 years. A defendant named Warsame got two and a half years. Then the seventh defendant was -- I'm sorry, it's the -- there are three defendants in Minnesota that got ten years, so there were a variety of those Minnesota cases.

But if you look at the Sentencing Memorandum, we've largely summarized most of these cases which are, we would submit, comparable to my client's situation and were comfortably in that range of five to 15 years, which is significantly below what the government is looking for here.

Now, on the flip side of it, the government submitted you a Memo and suggested that the higher sentence was appropriate based on the cases they provided you. This is the point of the right half of this chart, which is to kind of give you a perspective on some of the high numbers they pulled, what was -- you know, there were critical differences there.

Barb, I'm going to grab some water.

THE COURT: Sure.

1      (Pause in proceedings.)

2      MR. MONAHAN:  I broke these down into categories to

3  try to just make it easy to see everything they had cited on

4  their chart, kind of in an easy-to-read format.  The first

5  four defendants there were sentences -- you can see those were

6  sentences of 20 years, 30 years, 28 years and 15 years.

7  That's defendants with a prior record.  The point of that

8  being, there were four defendants who came into their cases

9  with a prior record.

10      For example, the *Morgan* decision, *United States versus*

11  *Morgan*, the defendant got 20.25 years, had a prior felony for

12  shooting into a habitation.

13      *Khalifi*, which was cited by the government, that's the

14  second one over, the defendant had prior offenses from

15  multiple jurisdictions, including drug offenses and two prior

16  assault convictions.  That was a 30-year sentence.

17      The third defendant was *Finton*, which is also on the

18  government's chart, a 28-year sentence.  That defendant had a

19  prior sentence for armed robbery and aggravated assault.

20      Then the fourth defendant is -- Davis was the last name,

21  got 15 years.  He was on parole at the time he committed the

22  crime.  I couldn't glean anything else from the record other

23  than he was on parole.

24      So, in looking at all the cases they cited, those four all

25  had prior records, which, obviously, is an aggravating

problem.  The one that got the longest sentence, the 30-year sentence, had prior offenses from multiple jurisdictions.  The one with the 28-year sentence had a prior sentence for armed robbery and aggravated assault.  So these were already violent or drug offenders when they came into the federal charge.

The next category is defendants --  I called it "lit the fuse on a bomb."  These are bomb cases.  This is where the government gets the bulk of the high sentences to present to you from its chart.  All seven of these people actually planted a bomb and did the acts necessary to make the bomb blow up, a weapon of mass destruction.

The first one there, that's a 24-year sentence.  That's the *Smadi* case, S-M-A-D-I, which is cited in the government's Memo as a comparable cases.  That defendant put a truck of explosives in a 60-story building and clicked the detonator to blow it up.  That would have killed, by the Court's estimate, 2,000 or more people.  This defendant was illegally in the United States, faked hallucinations during the course of his federal case, and admitted that he came to the U.S and then stayed here illegally with the purpose of killing U.S. citizens.  So this guy pulls the trigger, truck explosives.  Fortunately, they were fake explosives provided by an informant, but would have killed 2,000 or more people.

The next case that the government cited has a 30-year sentence.  That was the *Mohamud* case from the chart that they

have on the Sentencing Memo.  This person planted a bomb at a
Christmas tree-lighting ceremony.  And, again, it's a vehicle
bomb, pulls the trigger to detonate it, it's not real
explosives, and it doesn't blow up; but, again, all the acts
necessary to actually kill a lot of people.  This person had
been planning to do this kind of thing since age 15.  He's
arrested at age 24.

I would also point out, that guy went to trial.  He wasn't
included in my "went to trial" section because I didn't put
someone in more than one section.  That defendant who got 30
years went to trial also.  That was the *Mohamud* case the
government cited in their Memo.

The next case is *Martinez*.  This is also in the
government's Memo.  This person placed a bomb at an Armed
Forces recruiting station and attempted to blow it up.  Again,
it wasn't going to blow, but it was, you know, obviously a
very, very serious offense.  In that case, it was actually an
agreed sentence between the defense and the government of 25
years.  So that was not necessarily the Court's discretion who
imposed 25 years there.

The fourth case over is a 23-year sentence.  Hassoun was
the defendant's name.  He placed a bomb right near a baseball
stadium in Chicago.  That was actually a ticking time bomb
that they found.  So he placed it, set it in motion for it to
explode, and they located it before it would have blown up.

1    It would have blown up the Chicago baseball stadium.  That guy

2    got 23 years.

3        Harpham, H-A-R-P-H-A-M, got 32 years.  He is the fifth guy

4    over here.  He was a white supremacist, not associated with

5    any terrorist organization -- well, I know that we -- not

6    associated with ISIS.  I know that's a distinction the

7    government tries to make, but this guy was a white

8    supremacist.  They cited this case.  He got 32 years.

9        He placed a bomb at the Martin Luther King Day parade and

10   was blowing -- you know, attempting to blow it up.  He also

11   placed rat poison in the bomb, which is an anticoagulant, to

12   make sure that people who were hit by it, their blood didn't

13   coagulate so they would bleed to death faster.  The parade had

14   actually been rerouted, unbeknownst to him.  So he had the

15   bomb placed, and the parade turned the corner before it got to

16   where his bomb was.  So he didn't blow it up, but that was a

17   completed act at that point.

18       He got 32 years.

19       Nafis, N-A-F-I-S.  This is the sixth one over.  He got 30

20   years.  He planted a bomb at the Federal Reserve Bank in New

21   York and attempted to blow it up.  Again, it was fake

22   explosives, so it did not blow.  He admitted that he moved

23   here from Bangladesh to the United States to wage war.

24       And, finally, the seventh defendant over, Loewen,

25   L-O-E-W-E-N, again off the government's chart.  He was an

airport employee who planted a bomb at the airport and
attempted to detonate it, and, of course, it wasn't going to
go off either.

All seven of those higher sentences were defendants who
actually planted a bomb and tried to explode it and, for one
reason or another, it did not go off.

So, again, we submit these are all guys who are all
significantly down the line from where my client stands, would
have killed mass destruction of amounts of people in their
cases. So we distinguish the government's effort to point to
those cases as being different from what we have here.

I'll spend a lot less time on the remainder of those,
Judge. There are two cases where the defendants planned a
bomb but did not complete all the acts necessary.

The first one there, number one, got 17 years. He placed
explosives into a remote-control device that was going to fly
into the Pentagon, but that's as far as it got. He actually
just put them in the device. He didn't attempt to detonate
it. He got 17 years.

And then the last guy, the second guy there, his name is
Ahmed. Again, these are cases cited by the government. That
was an agreed sentence of 23 years. He had been involved in
planning to bomb multiple transit facilities around the city,
and the defense and the government agreed to 23 years.

The next one is Elfgeeh, E-L-F-G-E-E-H, which is on the

government's list.  He was -- actually the comment to that case is, "He is one of the only actual ISIS recruiters ever captured."  So an ISIS recruiter got 22 and a half years, which, I'd submit again, is very different from my client's situation.

The final three to the far right here are the Minnesota defendants, got 30 years, 30 years and 35 years.  The government mentioned that in the Memo.  All three of them went to trial; that's the part they didn't mention in the Memo.  So that's certainly distinguishable where people deny any responsibility and go to trial.

That's all the cases.  I think every case that's been cited to you fits into that rubric.

THE COURT:  Can I compare these other cases not involving terrorism?

MR. MONAHAN:  Pardon?

THE COURT:  Well, my concern --

MR. MONAHAN:  I mean, some of those are --

THE COURT:  The conspiracy case I talked about before where they just had a plan to knock off the drug dealers, I gave one guy 216, the other guy 180.

MR. MONAHAN:  I don't have any of those.

THE COURT:  I'm saying -- well, I'm not sure -- well, all right.  Go ahead.

MR. MONAHAN:  I don't know how broadly you want to

1    look at that formula, I guess is the question.  I think I know

2    the case you're talking about, and they're facing around 15

3    years, is my understanding, but I'm not on that case, so.

4              THE COURT:  No, these guys are already gone.

5              MR. MONAHAN:  And all those guys, I think, have prior

6    criminal records for doing that kind of stuff too, which I

7    think is a big distinguishing feature in these cases.  Here

8    you have 38 cases that are at least found in terrorism.  Some

9    of them are not ISIS related.  Some of them they did find were

10   ISIS related.  But --

11       I don't know.  I think it's easy to look at one of these

12   cases and look at the plans and say, "Oh, my.  ISIS is such a

13   problem in this country.  We need to punish, punish, punish."

14   But I think if you look at the broad spectrum of what Courts

15   are doing, it's not what the government is asking for here.

16   It's not what they're asking for.  They are not getting the

17   sentences that they are asking you to give for these kinds of

18   facts.

19       In the end, we'd ask you for five years.  I've laid out

20   for you the median has been 15.  We're certainly asking you to

21   consider something below 15.  We submit five is appropriate

22   given these facts.

23       So, in sum, you've got a guy here who is a good kid.  I

24   think the Court is exactly right that he's a follower.  He

25   followed the number-three man on ISIS's list -- on the

government's list of who they wanted to take out in ISIS.  He
followed the suggestions of an informant, who was ten years
older than him by our knowledge.  But, otherwise, he was of
impeccable character.  He behaved himself entirely upon his
arrest.  He did everything he could to try to make this right.

We think, when you compare this to other cases of
relatively similar seriousness, that the government is way
above what Courts are doing in these types of cases.
Particularly, I bring you back to that Cleveland case where
you even had a defendant go to trial and got ten years.  Those
defendants placed a trigger on killing a bunch of people.

So, in the end -- you know, in the end you've got him on
supervised release as long as you need him on supervised
release.

I'm not even going to advocate to you what the Court can
do what it thinks is right there.  I think, you know, issues
about dangerousness to the community and the question of about
whether he'd fall back into this I'm certain can be answered,
in large part, with close monitoring by Probation on the back
end.

I'm going to submit to you, and it's kind of going out on
a limb here, but when you're thinking about a jail term,
what's the point?  I mean, what's really the point of locking
him Munir up?  Keep him away from society?  Right?  And punish
him.  And what else does he need?  Send a message?  You know,

there's a lot of messages all over the place.  They are all over the board too.

You're going to punish him, and you're going to keep him out of society.  That's what we're doing with incarceration in this case.  He doesn't need rehab -- he doesn't need -- I mean, are they going to -- if he's radicalized, are they going to do that in the BOP?  No.  He's going to get in there with a bunch of guys who are hardened criminals, is what he's going to get.  You walk in with Criminal History VI, because that's what the guidelines say, so you're putting him in with a bunch of hardened criminals.  Now, what is that going to do for his future likelihood of recidivism?

He is educated.  He's smart.  He made some very bad choices on who he followed, and he's not going to do that again.  If you keep him locked up for five years or 20 years, you're just holding him there until he gets out.

So we're hopefully trying to get the Court to see that this is not -- you know, the circumstances that arose in this case are not going to happen again.  He's not going to do this again.  That wasn't the kind of person he was coming into this.

So we would submit five years is sufficient time.  Put him on supervised release for life.  If he steps out of line, send him back.  Probation can put stuff on his computers and monitor him for life, what websites he goes to, where he

works, who he associates with.

It's enough. It's enough in this case.

Thank you.

THE COURT: Thank you, Richard.

Munir, do you want to say anything at this time?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. If you're comfortable seated, that's fine, or you can stand at the podium.

THE DEFENDANT: It doesn't matter.

Good afternoon, Your Honor. I know I'm responsible on my behalf of being involved in such terrible acts, and I do claim responsibility. I do sincerely apologize to the Court for my actions. I cannot come up here and make any sort of excuses.

There is no possibility of me ever falling into the same situation or making the same decisions that I made in the future, Your Honor.

I've had 18 long months to reflect upon this whole situation in its entirety and see how I can change myself and to reflect upon my conduct. I mean, I'm not proud of my conduct. I'm not proud of who I supported, what groups I support, and the decisions I made. Even a year and a half later, Your Honor, I don't understand how I let myself go to that extent.

But what I can do is, Your Honor, is apologize to the parties for my misconduct and -- apologize to the parties, to

the Court, to the soldier and his family if I caused any sort

of panic or distress.

And, in all, Your Honor, it has been a life-changing

experience.  I've taken a huge lesson from this whole ordeal.

I've said a lot of serious things, made some very bad choices.

But, again, Your Honor, I sincerely apologize to the Court

for my actions, and I can promise it will never happen again.

I can only ask from -- I can only ask Your Honor to please

have mercy upon me in your honorable court.

That is all, Your Honor.  Thank you.

THE COURT:  Okay.  Thank you, Munir.

Tim?

MR. MANGAN:  Your Honor, let me kind of start with

where the defense left off in terms of these other cases.

There are many factors for the Court to consider.  Only

one of them is unwarranted:  disparities with other sentences.

If you want to concern yourself with uniformity, well, look at

the guidelines.  That's what they're there for, to help ensure

uniformity.

We don't know the guidelines.  We don't know all the

factors in all these other cases.  Going down this path of

trying to look at a complete survey of every similar case in

the country, it's a fool's errand.  I mean, I'm not even sure,

kind of, why we're going there.  We can't do that on every

attempted murder case.  We can't do that on every drug case.

1          THE COURT:  Well, I know, but it's a decent exercise.

2     It's not really a fool's errand.

3          MR. MANGAN:  Well, the part of it that is

4     problematic, Your Honor, is we don't know who is cooperating,

5     you don't know all the other factors, you don't know the --

6          THE COURT:  No.  I totally get that there's a lot of

7     behind-the-scenes stuff you can't go by.

8          MR. MANGAN:  A number of these folks he's mentioning

9     here, the Minnesota case, you have some folks who testified,

10    you have others who went to trial, you have some who are

11    leaders, some who weren't.  So that's why you have a huge

12    range, you know, all the way up to the 35 years.

13        The same thing with the *Khan* case.  That was somebody who

14    cooperated and was going to testify.  One of the travelers

15    they mentioned was going to be a wife.  You know, it was a

16    totally -- a different situation entirely.

17        So I just want to, sort of, throw out that general caution

18    that we don't know all the facts about these cases.  At least

19    we can't really try to get a handle on all of that and really

20    make an informed decision about where they all are.

21        He mentioned, you know, those who have criminal history

22    versus those who don't.  Well, you know under the guidelines

23    that that's not going to impact it either, because they all

24    have -- if it's a terrorism case, it's a Criminal History VI.

25    He would be in the same guideline range as someone who had a

prior conviction for anything. So, in that respect, it doesn't matter.

All we tried to point out to the Court was if we're going to go down this path, let's look at something somewhat analogous in terms of those who are going to try a violent attack here in the U.S. The travelers cases simply aren't the same. If somebody does a traveling type of case and they're charged, they would've only faced Count Three of this case, only the Material Support, with the maximum of 15. And, depending on the circumstances, you know, if they're -- you know, some of these are minors, some of these are going to become a wife. They are getting lesser sentences or they are cooperating.

This is a different case. He decided, or at least at one point, you know, in early 2015 he talked to the source about wanting to travel. So they started recording, and that's the course he was going down. That's what it appeared to be, based on the passport. And if he had bought a ticket and gone to the airport, he was going to be arrested, and that's where we would have been.

That's not what happened. That's not at all. He changed course. And Junaid Hussain helped push him to a different course when they decided it simply had gotten too dangerous to go to an airport.

The fact is, these cases that were being produced

successfully, disrupted in spring of 2015. There were a number of folks, including individuals that he had been in contact with, folks he had become, you know, online friends with who had gotten arrested at the airport. That's when he, you know, pivoted.

So the traveler cases are different, and that's why we're not dealing with that kind of case today. We're dealing with a very different case. And so the analogous cases are the ones that involve a violent attack here in the U.S.

The best ones that you have to look at happen to be these bomb cases. If he had wanted to do a bomb, it would have looked the same. They wanted to do an attack with guns. All right? Well, at that point, the FBI has got to arrest him when he gets the gun. We can't have him walking around and wait until he's at the guy's house. You have to wait for a rational period or a rational point in which they have taken the substantial step but, at the same time, ensure the safety of the public. Here, it's when he bought a gun and all the -- and everything else he needed.

So it's the same as those other cases, and that's why we tried to point those out to say that this is really the logical range which fits with the guidelines and fits with what we're recommending. It's nowhere close to what the defense is recommending.

So we simply want to point out, in terms of looking at

other sentences, it's not terribly helpful; but if you're
going to look at them, you need to focus on those higher
sentences that relate to these homeland attacks.  No matter
what the reason was or what the method was, the fact is, if
they're trying to do a homeland attack, it tends to be a much
higher sentence.  That's borne out from beginning to end.

It's interesting, one of the cases they point out there is
the *Mohamud* case, which was the Christmas tree-lighting.  This
goes into what he pointed out in his initial remarks about the
character and history of the defendant, that he's young, that
he doesn't have a record, that he hasn't gotten in trouble.
Well, a number of these folks fall into those same categories.
The gentleman who tried to blow up the Christmas tree-lighting
ceremony was young, had no record, and, still, he wanted to do
that.

And I point out that case in particular because that's the
one that Mr. Sageman opined was not a danger.  That guy got 30
years.  But it also kind of lets you know where that expert is
coming from.

But it goes back to the history and characteristics that
they're pointing out.  A lot of these individuals are young.
A lot of them don't have a record.  That really doesn't mean
that they're not going to get in trouble.  It doesn't mean
they're going to execute one of these attacks.  Look at some
of the folks who have executed these attacks and died in them.

They fit the exact same profile in a lot of these cases.  So
the fact that he otherwise hadn't been in trouble doesn't mean
a whole lot considering what he was doing.

I know a lot of his friends and family are shocked, and
that's reflected in their letters.  But the fact is, look at
what he wrote on Twitter in 2014 before he even meets a
source.  Look at what he's putting out there.  He's talking
about martyrdom, that he wants to give his parents a martyr in
their family instead of a graduation.  The fascination with
beheadings.  This is all -- these are his own writings.  This
isn't just re-tweeting.  This isn't just somebody else giving
him ideas.  This is him becoming fixated with what was going
on and putting out his own statements about what he believes
and what he thinks and what he wants to do.  It's shocking.
It's chilling.  That's why he ends up, you know, being watched
and getting on the radar.

But that's all by himself.  The passport application, his
decision to try to go to Syria, that was all him, all by
himself, all before the source ever got involved.  So to sort
of make it sound like he's purely a follower?  Maybe he got
influenced by what was going on online, certainly.  I don't
doubt that at all.  But he has taken some initiative in here
well before anybody else gets involved.  He gets connected
with Hussain and other people online long before the source
gets involved, and maybe he begins following them and that

only leads him further down the path.

But the fact is, there is some degree of initiative in this.  I don't want this to come across that he is completely passive and just sitting in the boat from beginning to end, because he's not.

THE COURT:  It doesn't.  It doesn't.

MR. MANGAN:  If you look at his behavior in '14 and everything he writes, the passport stuff --

Look, he gets a warning.  His brother gets spoken to.  His mom gets interviewed.  And, instead, he changes Twitter accounts and just keeps doing the same thing, becomes more radicalized?

I know that wasn't mentioned, but the fact is -- look, this is -- there were chances for him to off-ramp himself, you know, to go a different path, and you never see it.  There is never a point where he says, like you pointed out with the gun ranges, never a point where he says, "Hey, you know, I'm not into that.  I'm not going to go there."  He never does that at any point.

A lot of these are his own ideas in the beginning.  And then when you get into where he's working with Hussain, he is the one who is actively getting all the information about travel and becoming the expert in that.  Really, at that point the source is just a traveling companion.

And it kind of comes down to, "All right.  We're going to

go in May." All the arrests happen in April, and they decide

not to. And they say, "Okay." And, at that point, it's over.

The question is: All right. What are you going to do

then? Where does it go from there?

And we knew at that point that he had been talking to

Hussain, and that Hussain starts putting in his mind the idea

of the homeland attacks and the Garland, Texas thing.

That's a significant thing that I'm going to come back to.

But in terms of what his friends and family knew and how

he was before all this and that this seems out of character,

well, a lot of folks in his situation have done pretty

terrible things and have plotted to do pretty terrible things

that seemed out of character to their friends and family who

didn't know what they were doing in their private time.

They talked about his conduct after the arrest. I don't

disagree with anything he did, as we've already explained to

the Court, but I would also emphasize to the Court that

everything he did after the arrest is already included, it is

already considered, it is already part of the guideline range

that is now before the Court.

That has already been factored in, and factored in

generously, I would add, to where the guidelines are right now

before the Court, which is where the government is

recommending a sentence.

So then we kind of turn to this issue that they've raised

1   with respect to Mr. Sageman.  I think -- I'm not going to go

2   over everything that was in our response.  I think you

3   understand our arguments why we don't believe that much weight

4   should be given to this expert.

5        Obviously, one of the things we take issue with is that

6   you can't have an expert come in at sentencing and, more or

7   less, contradict the Statement of Facts, contradict the PSR,

8   give what's called an expert opinion about what is essentially

9   normal offense conduct.  You know, the Court can read a

10  transcript as well as anyone else, so we don't know why it's

11  considered an expert report.

12       To the extent they were trying to -- Mr. Sageman was

13  trying to put this out as an opinion on entrapment, which is

14  certainly a word that he uses, it's not proper.  If it was

15  that type of case, it wouldn't need to be an opinion about a

16  particular medical condition or susceptibility.  He doesn't

17  give any kind of opinion like that.  This is really just his

18  own take on the transcripts.

19       As we explained, he comes in with a pretty fixed bias when

20  he came into this.  He doesn't like informants.  He believes

21  all of those are improper.  And so he comes in, and he more or

22  less recasts the facts in this case to try to fit his

23  conclusion.

24       He's also put in the uncomfortable situation where he just

25  published a book saying that ISIL hadn't directed anyone here

to do any attacks, and then he meets this defendant and realizes that's wrong. A lot of things he wrote in his book were wrong. So he rewrites his report to try to fit his version of the world and what's going on.

That's why we believe it shouldn't be given much credence, not to mention the fact that he omits or minimizes a lot of significant things involving the defendant's own active conduct in initiating actions in this case. We already mentioned all the Twitter activity, the changing of the accounts, the passport, all things that he ignores or at least minimizes.

But, most importantly, the fact that the defendant was the one who reached out and met these ISIL operatives in Syria online by himself and began communicating with them directly, not just Hussain, but others. That was all done at the defendant's own initiative. A lot of that is just ignored and downplayed in that report.

But the fact is, you've got an ISIL recruiter who is in the defendant's ear throughout this case with ideas, with advice, with motivation, and that is a significant factor. And to ignore all of that and try to blame it on the source -- and most of the stuff you see from the source is simply asking, "What did Hussain tell you? What is the plan? What does he want you to do?"

I think the way he concludes that this all should be laid

on the head of the source is completely wrong.  It's wrong on
the facts.  He omits all these critical elements and, frankly,
he misstates a lot of things.  As we kind of went through, we
pointed out --

I'm not going to go through the transcripts.  I mean, the
fact is, these guys met for hours and hours.  The fact that
they talked about guns or gun laws, you know, doesn't mean
anything.  That's different from talking about an attack.
People can talk about gun laws all they want.  The question
is:  Who comes up with the attack?

And what we pointed out pretty clearly was that it was
this defendant who, out of nowhere somewhat, in the gun
conversation says, "The only time I'd buy a gun is if I find
something here."

The source says, "Really?"

And the defendant says, "FBI.  Their headquarters is so
far away, there is no point," but then goes on to talk about
how tough a job it would be to attack the FBI headquarters.

Nobody else had mentioned the FBI.  Nobody else had
mentioned any target until this defendant brings it up.

And then we go through all the other examples.  The
Pentagon comes up, and then finally it's through his
conversations with Hussain that they come out and talk about,
first, military bases.  Then when that is decided that's too
difficult, they talk about a police station.

1    And you see in the exchanges between Hussain and the

2    defendant where he says, "Police station it is," and then they

3    start getting into the details.

4    And then it turns to adding in this element of kidnapping

5    and attacking somebody at a military base.

6    So, the point is, all of these targets, all of these

7    ideas, the source does not suggest a single one of them.  He's

8    simply there to ask follow-up questions and to try to find out

9    what they're planning, what they're doing.  And it was

10   entirely appropriate.  Anything else suggested to the contrary

11   is just -- it's revisionist history in terms of what happened

12   here.

13   And the last point I'll make on that, Your Honor, and then

14   I'll kind of leave off this expert report, was, you know, it's

15   pretty telling the fact that they had direct conversations

16   between the defendant and Hussain.  These are conversations

17   that they would do online, and the defendant had no reason to

18   know that the source would ever see this.  He has no reason to

19   think he's going to be caught.  You know, these are private

20   conversations between the defendant and Hussain, you know, on

21   his phone or whatever.  The source isn't part of it.  He's not

22   part of a three-way conversation.  These are direct

23   communications.  And that's why we put those in the report or

24   in our memos and tried to emphasize those.

25   Going right up until that last day, you've got the

defendant writing to Hussain about who they would want to target and that he wants a recent veteran, he doesn't want some old military person. That's out of the defendant's mouth, nobody else's. The fact that he asked for advice on doing reconnaissance, that's the defendant's request of Hussain, not anybody else's.

Then they start talking about what they're going to do, and he writes, "We will hold them all, tied up with zipper tie. Very good for detaining and restraining, isolates the kalb from the family. Akhi, I think everything will be fine, but what I need from you is to devise a plan on how to get in. This is major, and I need your help with that."

This has nothing to do with -- the source isn't writing this. This is Munir writing this to, more or less, his handler, Junaid Hussain, trying to get details about this plan and what they're going to do. He talks about doing the surveillance. They talk about going to the gun range.

His reaction to it? As you said, he didn't stay in the car. His reaction, "Whole new experience, but did well. I love it. Got the targets in the face or stomach."

Hussain responds with a smiley face, says, "Next time you will be shooting kuffar in their face and stomach. Inshallah," which means "God willing."

The defendant responds, "Inshallah. Getting it later," smiley face, then asks what -- and they're talking about the

1    gun, that he's going to get the gun.

2        Then later on after he buys the gun, he's sitting in the

3    car, doesn't know he's about to be arrested, texts Hussain --

4        Again, this is him doing this.

5        -- "The package has been received," smiley face.

6        Okay?  This is not -- look, if you want to say Hussain was

7    more the alpha dog than the defendant, fine.  Probably is,

8    given his position in the organization.  But was this a

9    willing soldier?  You bet.  Sure was.

10        And we should be lucky that we had a source that was able

11    to -- that he would confide in, because there are plenty

12    others where we don't, and they find somebody else that

13    they're very close to that they wouldn't ever, you know,

14    confide their government source:

15        Boston, two brothers.  San Bernardino, a husband and wife.

16        Those are successful, unfortunately.

17        We're fortunate that he confided in somebody else here

18    because, otherwise, it's -- you're right.  He meets up with

19    somebody else, and this is a different case.

20        So I think to try to point this and blame this on some

21    third party is -- it's just a red herring.

22        I'm going to wrap up, Your Honor, because I know we've put

23    a lot out there already.  What I want to emphasize is, this is

24    a different kind of case.  I know the Court gets a lot of

25    different things here, but the fact of the matter is, there

1    are -- this isn't drugs, it isn't money, it's not contraband.

2    It's attempted murder.

3        But even within the scope of attempted murder cases, which

4    are rare here, this is different.  This is a different kind of

5    case.  It's different because of the motivation.  Okay?  We're

6    talking about -- it's not based on trying to get money or

7    drugs or a personal beef.  This is because the defendant has

8    aligned himself and pled allegiance to a foreign organization,

9    an organization that is, more or less, at war with the U.S.

10        And this is an organization that -- I know it doesn't

11    matter which FTO it is, but in this case, in reality, it does.

12    It's ISIL.  This is a group that has perpetuated some of the

13    most barbaric violence we've seen in modern times, and that is

14    who the defendant has aligned himself with and against the

15    United States.

16        So the motivation for this is different.  The idea is to

17    create an attack on the United States.  You know, they are at

18    war with us, and we against it.  And, more or less, he has

19    picked sides and aligned himself with them.  And that's his

20    motivation for doing this, which is a huge concern.  And it

21    does matter.  It is different than the other cases.

22        The potential victims are different too.  You know, this

23    isn't somebody he knew.  The idea was to pick strangers.  In

24    this case, they wanted to identify and specifically target a

25    government employee.  And not just any.  They wanted a

military veteran because that was seen as an attack on the
U.S. military, and they wanted police officers as victims
because they felt that would serve -- that would send the
right kind of message for what they wanted to do.

But the fact that they have chosen individuals in our
community who have chosen to serve and protect us makes this a
different kind of case too, that they are intentionally
targeting the people that are trying to protect us.

I know the Court has the letter from the victim, or at
least the intended victim whose family was going to be
targeted.  In the letter, he writes, "My wife and children did
not understand this particular threat, nor did they sign up
for it.  The very thought that someone would go to extremes to
physically split our family apart or even threaten our lives
or livelihood is surely something that never crossed any of
our minds.  It's still something I think about to this day."

I should point out that in those bombing cases where
somebody pulled the trigger and nobody gets hurt, you don't
have a victim like this.  We do here.

I'd also point out -- look, the methods that we're talking
about here are different too.  We can search for every case,
and you can look anywhere, and every sentence, I don't know
that you'll find a case where somebody was trying to kidnap a
military veteran, kill them in their house, behead them,
videotape it, publish it worldwide, become famous that way.

1    There isn't.  There isn't a precedent for this.

2        The fact that they can talk so casually in a Walmart about

3    what knife to choose for this, it's sickening.  The idea of

4    just walking into a police station and throwing bombs and

5    shooting randomly at people, it's just a lack of respect for

6    human life that is reflected in the defendant's own words that

7    sets this case apart as well.

8        And all of these things, Your Honor, that I'm trying to

9    point out -- the motivation, the victims they are targeting,

10   the methods -- it all factors into, when you're talking about

11   terrorism, the propaganda that they're trying to put out

12   there.  The fact is, with every attack, you know, ISIL or a

13   group like this is trying to win over hearts and minds.  The

14   defendant was inspired by other attacks, and he was trying to

15   do an attack that would inspire others as well.

16       So you can't underestimate the fact that when there's an

17   attack on behalf of ISIL within our borders, that it is of

18   value to ISIL; and if it's done by our own citizens, it's even

19   greater value to that organization.  That is why this kind of

20   homeland attack, plot, is -- it's different.

21       And, unfortunately, this isn't a hypothetical.  I'm not

22   going to go through every case.  Look, the fact is, we know

23   about all the big-name terrorism attacks that have happened,

24   certainly worldwide.  They've become notable just by their

25   name, you know:  the *Charlie Hebdo*; the Bataclan theater;

Nice; Brussels Airport, and so on.

But here in North America we've got, unfortunately, a list of our own.  You go back to -- there was an individual who attacked the Canadian Parliament.  He killed a guard and then went in and started shooting in the Canadian Parliament back in October of 2014 right before a guy did a hatchet attack on New York police officers.  That was a big -- sort of a big start to some of this stuff.  The defendant celebrated that online, applauded them.

Then you go on to, you know, May, which is when the Garland, Texas attack happened.  And this is really significant to this case because you had Hussain reaching out to Munir directly telling him that he helped direct that attack, and then he was trying to pursue the same thing through others, makes a statement to the effect of "There's more to come."  That was one of the statements that Munir then relayed on to the source.

So you can imagine if, for a moment, you put yourself in the shoes of the FBI agents who hear that.  This attack has just happened.  The guy who directs it is telling this gentleman here in our district "There is more to come" and then starts giving him ideas for attacks.

So yes, our source was asking a lot of questions --

"What are you talking about?  What does he want you to do?"

1    -- because this was a serious situation and the fact that

2    he was inspired by the Garland attack.

3        Then in the last year, obviously, there has been San

4    Bernardino; there has been Orlando.  Just in September, there

5    were all those pipe bombs in New York and New Jersey.  Then

6    there was the guy who attacked a bunch of people at a mall in

7    Minnesota, stabbed nine people, just in September.

8        So the attacks are real.  They are not stopped.  You know,

9    these things do happen.  It used to be something that we

10   talked about in more theoretical terms.  Unfortunately, that's

11   not the case.  Even in our district, last February we had an

12   individual who attacked people with a machete in Columbus.

13       So this does happen.  I mean, this is -- unfortunately,

14   this is the reality we live in; that with every new incident,

15   it just becomes more sobering that, on any given day, a person

16   who is inspired by hate, like the defendant was, can go out

17   there and decide, "I'm going to buy a weapon.  I'm going to go

18   attack a stranger," whether it's a government employee,

19   military police, whatever.  "I'm going to go out and do this

20   to try to attack this country."

21       That's, unfortunately, what we're living in, and that is

22   the context, that's the setting for our sentencing here today.

23   That's, unfortunately, what we are dealing with.

24       And so we think these crimes are of the utmost

25   significance.  The guidelines support what we're asking for

here.  All of the factors that the Court needs to consider support what we are asking for.

For these crimes, the government is asking for a sentence of 25 years and lifetime supervision, and we believe that is the appropriate sentence for this type of case.

Thank you.

THE COURT:  Thanks, Tim.

Richard, anything else?

MR. MONAHAN:  Very briefly, Judge.

I think a lot of what the government has presented to you here is different than these other cases.  And there is, of course, the emotion of having a victim who wrote you a letter, which I know is -- this would have been a terrible, terrible traumatizing thing for that family.

But I'm going to say:  How is that different if we can locate the people who are on the bridge in Cleveland when it was supposed to blow up and get letters from them?  You know: If I plummeted 300 feet into the water below, my children would have, you know, lost me, and how awful that would have been.

There is not a difference there.  There is not a difference.  It's just we're able to identify a victim and get a letter from him.

I mean, you have defendants in cases here that try to blow up buildings with 2,000 people in them.  They could have

written 2,000 letters.  You know, the fact that we have a
single victim here who wrote a letter -- it's very sad, and
I'm not -- I don't mean to diminish.  These are all serious
crimes.  But that doesn't make this crime any more serious
than a guy who tried to blow up a bridge which would have
killed hundreds or thousands, or who knows how many people, or
a guy that tried to blow up a building with 2,000 people in
it.

This case -- and I think -- I'm going to take something
the government said there and kind of flip it.  The government
said, "In April, it was over."  You know, my client planned to
travel.  That was his plan.  In January, he tried to get a
passport.  They send the informant in at that point, and by
April he's seeing people getting arrested.  Getting arrested
scares him off of this.

Is a man who is going to be capable of putting a gun to a
military official's head, kidnapping and beheading him, is he
going to be dissuaded by the possibility of getting arrested?

He was done because he might get arrested.

That's April.  They -- the government just said it.  "In
April, this was over."  There is no travel.  The government
posed a question to you:  "Where is he going to go?"

What happened in April?  I showed you the transcripts.
During the discussion about travel, during the discussion
about getting on the Internet, the informant interjects, "Hey,

it's awful easy to get a gun, a rifle," and then proceeds to

talk about assault rifles, AK-47s and everything else.

Would it have been done if the informant had not done

that?  We're never going to know.  Yes, it was done because my

client planned to travel.  That was his plan, was travel.

He's got Hussain in one ear, and he's got the informant in

the other, and I think the importance of that expert report is

to give you those subtleties.  Mr. Mangan pointed out a couple

of instances where he thinks it shows that my client was

perhaps being, you know, the idea person and the informant --

the expert gave you, like, 30 of them where it was the

informant making suggestions, you know, little subtleties

like:  "Hey, maybe we need an assault rifle."

Keep this in mind.  And this is what I will finish with.

The government references a substantial step toward

committing the crime.  That's why they prosecuted my client,

he took a substantial step.  What was his substantial step?

The informant said he could get him a gun for, like, 350

bucks, so my client scrapes together 350 bucks and gives it to

the informant.  The informant goes and buys the gun.

I don't know, it was probably a setup; I'm sure there was

no actual sale of an assault rifle for $350.

My client never even touched the gun.  The informant buys

it with the cash my client hands him and puts it in the trunk

of the car.  Keep in mind, my client had never seen a gun in

real life. Of course the informant took him to a shooting

range; but, before that, he had never seen a gun in real life,

he'd never handled a gun. If you look at the expert report,

he didn't even know where to put the bullets in a gun. That's

what's going on when the informant suggests they go to a

shooting range, which the informant is, of course, experienced

with, like he is with everything else in this case.

So my client's substantial step was: Give money to an

informant who buys a gun way under the price you could

actually get one of those for.

These other guys' substantial steps was: The bomb is

planted, there's 2,000 people above it -- (making noises) --

and I'm trying to explode it.

That's a very different case, actually. It's a very

different case. I think the difference is self-evident.

And I'm sorry if I'm being -- I don't mean to be overly

dramatic about it, but these were important distinctions.

THE COURT: No, it's all helpful.

MR. MONAHAN: This is why, we submit, that a sentence

of what we have requested is appropriate.

Mr. Mangan referred several times to the guidelines and

the uniformity and how important that is. The guidelines are

one factor, just like it's a factor you consider what other

people got. They have not pointed you to a single case where

a guy got the guidelines called for for this, not one, not a

1  single case.  No defendant has gotten this guideline sentence,

2  not one.

3     The guidelines or whatever how many billions of years

4  that, you know, that the guidelines call for for this, life in

5  prison, no one has gotten that.  The highest sentence was 35

6  years, and that's the guy at the top of the Minnesota

7  conspiracy who went to trial.

8     So this whole thing about the guidelines establish

9  uniformity, no judge is doing what those guidelines call for.

10  You know, you're getting four, five years' time served for

11  cases that are similar to this.

12     This was a travel case that became something else in April

13  when the informant starts suggesting how easy it is to get a

14  gun.

15     We submit that the five-year sentence is appropriate.

16     Thank you.

17        THE COURT:  Thank you, Richard.

18     Tim?

19        MR. MANGAN:  Just -- the conversation in April is

20  when they're still talking about traveling.  Bear in mind,

21  they are traveling to go become fighters.  Okay?  So they're

22  still talking about the guns anyway.

23     The point is, when they pivot, what happens there, all the

24  talk about targets, all the talk about the homeland attack,

25  that's coming from Abdulkader and Hussain.  It does from

1  beginning to end.

2      And to say that there are no guideline sentences is just

3  wrong here.  We read off -- we cited all the ones where they

4  are in the twenties.  We don't know the guidelines because we

5  don't have the PSRs for all of these.  But the fact is, are

6  there sentences in this range?  Absolutely.  Absolutely.

7  That's what we cited them for.  But we also tried to point out

8  that --

9      Judge, this is -- some of this is unprecedented, and you

10  just have to kind of try to work through it the best you can.

11  But the fact is, we are dealing with a different situation

12  right now.  Suddenly -- I mean, the number of ISIL-related

13  charges -- obviously, this group didn't emerge until the

14  middle of 2014.  So here we are at the end of 2016.  There

15  have been a lot of charges.  A lot have gotten to sentencing.

16  A lot of them have not.  A lot of them are charged, but they

17  are not yet at sentencing.  So we also need to realize where

18  we are in the spectrum or the lifecycle of this as well.

19      This is one of the most significant plots by ISIL to

20  perform a homeland attack here that was prevented, and that's

21  what's being sentenced.

22      Thank you.

23          THE COURT:  Okay.  Thanks.

24       So we're looking at a Level 34, Criminal History VI;

25  right, gentlemen?

1      MR. MONAHAN:  Yes, Your Honor.

2      THE COURT:  Okay.

3   As you both know, it's my duty to impose a sentence which

4 is sufficient but not greater than necessary to comply with

5 the criteria set forth in 18 U.S.C. 3553.  So in arriving at

6 that, as Tim said, I work through it the best I can.

7      You know, this is a serious case.  I have to address the

8 nature and circumstances of the offense first.  I also have to

9 consider Munir's personal history and his characteristics.

10      There's no question, based upon the result of the

11 communications he's had with the overseas commander, that he

12 was on a path for some form of destruction:  initially, I

13 suppose, out of the traveling thing; secondarily, out of the

14 actual attacks that were talked about.

15      And, frankly, a lack of sophistication does not mean the

16 same thing as a lack of intent.  We're talking about a plot

17 here to kill a government employee who was identified.  As was

18 pointed out, the concept was to videotape a beheading and then

19 use that for publication.

20      We also had the planned attack on a police station using

21 Molotov cocktails and firearms, and the AK-47 was acquired to

22 do that.

23      In balance of that, you have a person that, prior to this

24 offense, had no criminal history and, as adjudged by the

25 letters that were sent in to me by his family and, I think,

probably confirmed in the PSI, a lack of indication that this type of behavior was in the offing.

But, on the other hand, as I said, he was on the path, he was in communication, and he was working in that direction.

So, based upon everything that's in front of me, I believe the appropriate sentence, taking into account the nature of this particular offense, his past conduct, the deterrent effect, and respect for the law, which I have to, I think the appropriate sentence in this case is 20 years' imprisonment, broken up as follows:

On Count One, a term of 180 months;

On Count Three, a term of 180 months. Those two counts are to be served concurrent with each other;

On Count Two, a mandatory minimum of 60 months, which is to be served consecutive to Counts One and Three.

So is my math right, Crum?

COURTROOM DEPUTY: Yes.

THE COURT: All right.

Following his release from imprisonment after the imposition of that sentence, he'll be on supervised release for life on Counts One and Three, five years on Count Two.

And, obviously, those are served concurrent with each other because life -- well, it's obvious those are concurrent with each other.

Within 72 hours of his release from custody of the

institution in which he is imprisoned, he will report to the

Probation Office in the district within which he is released

or will reside.

There is a 300-dollar special assessment which will be

worked off by -- if he's in a non-UNICOR or Grade Five job, 25

cents a quarter; if he's in a One to Four job, 50 percent of

his monthly pay will do that.

He will be given the set of rules of terms of supervised

release which we talked about at the time of the plea.  I

informed him it would include:

Not committing any other federal, state or local crimes;

Obviously not possessing, owning or using a firearm or

dangerous device;

No unlawful controlled substances, even though that's not

been an indicator in his past.

He will give the Bureau of Prisons or the probation

officer a DNA sample.

He is required, on his term of supervised release, to

install software to monitor computer activities on any

computer which he is authorized to use.  This will be done at

his own expense.  The software may record any and all activity

on the computer, including the captioning of keystrokes,

application information, Internet use history, e-mail

correspondence, and chat conversations, all of which is to be

checked on an intermittent and random basis at the discretion

1   of the Probation Department.  And it's clear the defendant has

2   no expectation of privacy as to his computer use.

3       He is not to tamper or mess with any type of devices that

4   are installed on the computer for monitoring purposes.

5       Any media device he has of any kind, which would include

6   cell phones -- you name it -- cell phones, computers, any

7   access to the Internet or multimedia-type things are subject

8   to search by the Probation Department at any time.  Also, any

9   type of monitoring system they can put in place on that, he

10  has to agree with that and pay for it at his own expense.

11      He is not to loiter near police stations, military bases,

12  state, federal or local government agencies or buildings

13  unless for emergency services.  Any visits to any such places

14  must be pre-approved by the Probation Department.

15      And he'll disclose any and all financial information as

16  requested by the Probation Department.

17      There is no point in a fine in this case because of the

18  length of sentence and the length of supervised release.

19      And I believe I did mention the 300-dollar special

20  assessment; correct?

21          COURTROOM DEPUTY:  Yes.

22          THE COURT:  Okay.

23      I believe that this sentence is fair and reasonable in

24  light of all of the conduct in this case and the applicable

25  sentencing factors.  I believe that a 20-year sentence is

1    appropriate.

2        At this time, Richard, if you have any objections you wish

3    to make as to any of the calculations previously stated or the

4    sentence, you may do it for the Court of Appeals.

5            MR. MONAHAN:  I don't think we have anything to add

6    other than what we've already presented, Judge.

7            THE COURT:  Tim, same thing to you.

8            MR. MANGAN:  No, Your Honor.

9            THE COURT:  All right.

10       I'm assuming that Munir wishes to exercise his right to

11    appeal the sentence in this case; is that right?

12            MR. MONAHAN:  I'm sorry, Judge?

13            THE COURT:  Well, do you want Crum to start the

14    paperwork to appeal the sentence in this case?

15       (Mr. Monahan and the defendant confer.)

16            MR. MONAHAN:  I think we'll discuss that, and I'll

17    follow up for him if he wants to do that --

18            THE COURT:  Okay.  Hang on a second before you get

19    there.

20       Yes, guys?

21            MR. MANGAN:  We're fine.  I didn't hear what he said.

22            THE COURT:  They're going to discuss it.

23       Did I leave anything out?

24            COURTROOM DEPUTY:  I just have one clarification.  I

25    think the PSI might have recommended suspending drug-testing

1    and treatment.  Are you going to follow that?

2           THE COURT:  Yeah, I kind of did.  I said based upon

3    his background, it doesn't look like that's a problem, so --

4           COURTROOM DEPUTY:  I just wanted to clarify.  And

5    there is also a forfeiture allegation as well.

6           THE COURT:  Okay.

7        Any contraband that was retrieved by the United States

8    will be ordered forfeited to the government.

9        Is there anything else?

10          MR. MANGAN:  No, Your Honor.  There is an appellate

11   waiver.  So, as I understand it, they'll decide, if they

12   determine it necessary, they'll file something in the next two

13   weeks?

14          THE COURT:  Yeah.  We'll talk about that in just a

15   minute.

16       Anything from Probation?

17          MS. SHANNON:  No, Judge.

18          THE COURT:  Did I cover everything?

19          MS. SHANNON:  Yes.

20          THE COURT:  All right.  Munir, there was a limited

21   appellate waiver.  There are certain rights that can never be

22   waived, but you have the right to appeal the sentence of the

23   Court if you wish to.  If, as you sit here today, you wish to

24   appeal the sentence, Miss Crum will start the paperwork.  The

25   Sixth Circuit Court of Appeals will appoint somebody to

1    represent you on your behalf.

2         Based upon what Richard said just a moment ago, I will

3    remind you you have 14 days within which to discuss with him

4    and decide whether or not you wish to appeal the sentence.

5         And so, Richard, what is the choice, on the record, at

6    this time:  to go ahead and file the notice of appeal, or to

7    consult with your client?

8              MR. MONAHAN:  We just discussed that again, Your

9    Honor.  I'm going to -- we will discuss the issue of appeal

10   over the next 14 days.  If he decides he wants to appeal, I

11   will file that appeal for him.

12             THE COURT:  You will protect his interests?

13             MR. MONAHAN:  Yes.  He does understand his right to

14   appeal.

15             THE COURT:  I don't believe I mentioned that he's to

16   receive credit for all the time that he has been held pending

17   the disposition of this case.  That's usually a mechanical

18   thing, but I will state it for the record.

19        Anything else, Barb?

20             COURTROOM DEPUTY:  That's all I have.

21             THE COURT:  Anything else, Richard?

22             MR. MONAHAN:  No, Your Honor.

23             THE COURT:  All right.  That's the order of the

24   Court.  Thank you.

25             COURTROOM DEPUTY:  This court is now adjourned.

1       (The proceedings concluded at 1:05 p.m.)

2

3

4                    C E R T I F I C A T E

5

6       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

7   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

8   S/MARYANN T. MAFFIA, RDR

9   Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25